667 A.2d 983

**Kevin D. GRAY**

v.

**STATE of Maryland.**

**No. 244 Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Dec. 4, 1995.

Arthur A. DeLano, Jr., Assistant Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for Appellant.

Rachel Marblestone Kamins, Assistant Attorney General (J. Joseph Curran, Jr. Attorney General, and Patricia Jessamy, State's Attorney for Baltimore City on the brief) Baltimore, for Appellee.

Submitted Before FISCHER, CATHELL and HOLLANDER, JJ.

CATHELL, Judge.

Appellant, Kevin D. Gray, was convicted by a jury in the Circuit Court for Baltimore City of involuntary manslaughter. The court committed appellant to the custody of the Commissioner of Correction for a period of ten years, with all but seven years suspended. Appellant presents two issues for our review, which we rephrase as follows:

1. Did the trial court err in admitting into evidence the redacted statement of appellant's codefendant that implicated appellant in the crime?

2. Did the trial court abuse its discretion when it substituted an alternate juror for a designated juror during trial?

After a review of the relevant facts and law regarding the first issue, we shall reverse appellant's conviction and remand to the trial court. We do not reach appellant's second issue.

Six young men were involved in the beating death of Stacey Williams on November 10, 1993. Investigation of the incident prompted the authorities to arrest Anthony Bell, who gave a written statement implicating himself, appellant, and Jacquin Vanlandingham (also known as "Tank") in Williams's death.[1] These three individuals were the only ones identified by name as having been involved in the beating.

---

1. Tank was fatally shot two days after the incident.

Appellant and Bell were scheduled to be tried jointly. Prior to trial, appellant moved to sever his case from Bell's, or, in the alternative, to exclude Bell's statement from their joint trial. The court denied appellant's motion to sever and ordered that appellant's and Tank's names be redacted from Bell's statement. Bell declined to testify.

At trial, Tracey Brumfield placed appellant at the scene of the crime. She testified that she saw appellant, Tank, and several others chase Williams down the street. Shay Yarberough actually witnessed the beating. He testified that he saw Tank kick and punch Williams several times and pick Williams up over his head and throw him head first onto the sidewalk three times. He also testified that he saw appellant attempt to pick Williams up over his head and drop him on the sidewalk. Detective Homer Pennington of the Baltimore City Homicide Unit testified that he was assigned to the case and, in the course of his investigation, interviewed Bell. During the interview, Bell gave a written statement implicating himself, appellant, and Tank in Williams's beating. The State was permitted to read the statement into evidence at trial, but, as previously stated, was required to redact the names of appellant and Tank therefrom; the words "deletion" and "deleted" were inserted in place of the redacted names. A copy of the statement was also introduced into evidence and blank white spaces marked the places where the names of appellant and Tank had been redacted. We shall address the actual reading of the statement before the jury, *infra.*

Appellant testified in his defense. He stated that he was talking to his girlfriend on a nearby pay phone at the time of the beating. Several other witnesses were called in appellant's defense. Renardo Bell testified that he saw Tank pick up Williams and throw him down, but he did not see appellant in the group. Lamont Matthews also testified that appellant was not in the group of people that had gathered around and beat Williams; that appellant was at a phone booth about half a block up the street. Chanel Brown, appellant's girlfriend, stated that appellant had called her from a pay phone and that appellant had said that Tank was up the street fighting. The

jury found appellant guilty of involuntary manslaughter. He filed this timely appeal from that conviction.

Appellant seeks resolution of a question left unanswered by the United States Supreme Court in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987): whether the introduction of a nontestifying code-fendant's inculpatory statement, which is redacted to exclude the names of all those involved in the crime by using the words "deleted" and "deletion," and the reading of that statement before a jury, violates a defendant's rights under the Confrontation Clause of the Sixth Amendment, even if the jury is instructed to consider the statement only against the codefendant-confessor. We hold that, under the circumstances of this case, it does and reverse. We explain.

■ The Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965), guarantees the right of an accused "to be confronted with the witnesses against him." The right of confrontation includes the right of cross-examination. Thus, "where two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand." *Richardson*, 481 U.S. at 206, 107 S.Ct. at 1707.

In *Bruton, supra,* Bruton and Evans were charged with armed robbery. Both were convicted after a joint trial, at which a postal inspector, to whom Evans had confessed his involvement and Bruton's complicity, testified thereto. The trial court duly instructed the jury to disregard the confession in determining Bruton's guilt or innocence and to consider it as competent evidence only against Evans. The Supreme Court began its discussion by noting what had been the Court's premise up to that point: that "it [was] 'reasonably possible for the jury to follow' sufficiently clear instructions to disregard [a] confessor's extrajudicial statement that his code-fendant participated with him in committing the crime." 391

U.S. at 126, 88 S.Ct. at 1622 (quoting *Delli Paoli v. United States,* 352 U.S. 232, 239, 77 S.Ct. 294, 299, 1 L.Ed.2d 278 (1957)). The problem with adhering to this principle had earlier been indicated by the dissent in *Delli Paoli.* Justice Frankfurter spoke for the four dissenters:

[T]oo often such admonition against misuse is intrinsically ineffective in that the effect of such a nonadmissible declaration cannot be wiped from the brains of the jurors . . . and fails of its purpose as a legal protection to defendants against whom such a declaration should not tell. . . . The Government should not have the windfall of having the jury be influenced by evidence against a defendant which, as a matter of law, they should not consider but which they cannot put out of their minds.

352 U.S. at 247–48, 77 S.Ct. at 303.

While recognizing the efficacy of joint trials, the *Bruton* Court also acknowledged that the potential for abrogation of a defendant's constitutional right of confrontation was a "hazard" that could not be ignored. 391 U.S. at 137, 88 S.Ct. at 1628 (quoting *Jackson v. Denno,* 378 U.S. 368, 389, 84 S.Ct. 1774, 1787, 12 L.Ed.2d 908 (1964)). Though the Court suggested the possibility that "viable alternatives" existed to achieve both the benefit of admission of the statement and the protection of a nonconfessor's right of confrontation, it stated that, when a confessor does not take the stand at trial and his confession is introduced into evidence, there is a "substantial risk that the jury, despite instructions to the contrary[ will] look[ ] to the incriminating extrajudicial statements" in determining the guilt or innocence of the nonconfessing codefendant, in violation of that defendant's Sixth Amendment right of cross-examination. *Id.* at 126, 88 S.Ct. at 1622; *see also Jackson,* 378 U.S. at 389, 84 S.Ct. at 1787. Limiting instructions were perceived by the Court as not being "an adequate substitute" for a codefendant's constitutional right of cross-examination: "The effect is the same as if there had been no instruction at all." 391 U.S. at 137, 88 S.Ct. at 1628. The *Bruton* Court then held, as we indicated, that, because of the "substantial risk" that the jury would consider an incrimina-

ting confession against the confessor's codefendant despite limiting instructions, the confession cannot be admitted in evidence unless the codefendant has the opportunity to cross-examine the confessor.

As stated, *Bruton* acknowledged that which the *Delli Paoli* dissenters had broached, *i.e.*, the possibility that a jury may not follow a curative instruction to disregard a confession in determining the guilt or innocence of a confessor's codefendant. Indeed, in *Delli Paoli*, the Court had sanctioned the use of limiting instructions. It was not until *Bruton* that the Court fully acknowledged that it was not realistic to assume that juries would follow the instruction once privy to information implicitly or explicitly inculpating the confessor's codefendant. 391 U.S. at 126, 88 S.Ct. at 1622. One approach suggested by the Court, that had been in use in several states, was the practice of deleting, or redacting, any references to the codefendant from the statement being introduced.

This practice was challenged in *Richardson v. Marsh, supra*, where the Supreme Court declined to extend *Bruton* and upheld the practice whereby the codefendant's name, as well as her existence, were eliminated and a curative instruction was given at the time the statement was admitted and again when the jury was charged. Over her objection, Clarissa Marsh and one Benjamin Williams were jointly tried on charges of murder, robbery, and assault.[2] At trial, the State successfully introduced a confession the police had elicited from Williams following his arrest. It had been redacted to omit any reference to Marsh—in fact, as read into evidence, it appeared that no one other than Williams and Martin had participated in the crime.[3] At the time that the redacted

---

2. A third suspect, Kareem Martin, was a fugitive at the time of the trial.

3. Williams's redacted confession in its entirety read:
 "On Sunday evening, October the 29th, 1978, at about 6:30 p.m., I was over to my girl friend's house at 237 Moss, Highland Park, when I received a phone call from a friend of mine named Kareem Martin. He said he had been looking for me and James Coleman, who I call Tom. He asked me if I wanted to go on a robbery with him. I said

confession was admitted, the court instructed the jury not to consider it in any way against Marsh. With the confession redacted, the only evidence that linked Marsh to the crime was: 1) Marsh's own testimony, in which she admitted that she was in the car with Williams and Martin while driving to the victims' house, and 2) Williams's confession that, while driving to the victims' house, he and Martin discussed their intent to rob and kill the victims. Marsh alleged that *Bruton* was dispositive of her claims; that introduction of Williams's confession violated her constitutional rights under the Con-

---

okay. Then he said he'd be by and pick me up. About 15 or 20 minutes later Kareem came by in his black Monte Carlo car. I got in the car and Kareem told me he was going to stick up this crib, told me the place was a numbers house. Kareem said there would be over $5,000 or $10,000 in the place. Kareem said he would have to take them out after the robbery. Kareem had a big silver gun. He gave me a long barrelled [sic] .22 revolver. We then drove over to this house and parked the car across the big street near the house. The plan was that I would wait in the car in front of the house and then I would move the car down across the big street because he didn't want anybody to see the car. Okay, Kareem went up to the house and went inside. A couple of minutes later I moved the car and went up to the house. As I entered, Kareem and this older lady were in the dining room, a little boy and another younger woman were sitting on the couch in the front room. I pulled my pistol and told the younger woman and the little boy to lay on the floor. Kareem took the older lady upstairs. He had a pistol, also. I stayed downstairs with the two people on the floor. After Kareem took the lady upstairs I went upstairs and the lady was laying on the bed in the room to the left as you get up the stairs. The lady had already given us two bags full of money before we ever got upstairs. Kareem had thought she had more money and that's why we had went upstairs. Me and Kareem started searching the rooms but I didn't find any money. I came downstairs and then Kareem came down with the lady. I said, 'Let's go, let's go.' Kareem said no. Kareem then took the two ladies and little boy down the basement and that's when I left to go to the car. I went to the car and got in the back seat. A couple of minutes later Kareem came to the car and said he thinks the girl was still living because she was still moving and he didn't have any more bullets. He asked me how come I didn't go down the basement and I said I wasn't doing no shit like that. He then dropped me back off at my girl's house in Highland Park and I was supposed to get together with him today, get my share of the robbery after he had counted the money. That's all."

*Richardson v. Marsh,* 481 U.S. 200, 205 n. 1, 107 S.Ct. 1702, 1705 n. 1, 95 L.Ed.2d 176 (1987).

frontation Clause. The Court held that the admission of
Williams's confession with the proper limiting instruction had
not impinged upon Marsh's right of confrontation because the
confession did not name her as a perpetrator of the crime or
indicate that she was in any way involved in it. *Richardson,*
481 U.S. at 211, 107 S.Ct. at 1709. Rather, it was her own
testimony, placing her in the same car with Williams and
Martin while they discussed their intent to rob and kill the
victims, that tied her to the crimes.

The Court explained that, in *Bruton,* it had recognized a
"narrow exception" to the general assumption that jurors
follow the instructions given to them. Where a confessing
codefendant does not take the stand, the Court opined, "the
risk that the jury will not . . . follow instructions is so great,
and the consequences of failure so vital to the [nonconfessing]
defendant" that it would not presume that jurors, under those
circumstances, would follow instructions. 481 U.S. at 207, 107
S.Ct. at 1707 (quoting *Bruton,* 391 U.S. at 135, 88 S.Ct. at
1627)). Under the facts presented in *Richardson,* where the
references to Marsh were redacted, Williams's confession was
only inferentially incriminating—that is, incriminating only
when linked with other evidence adduced at trial. In such a
circumstance, "the judge's instruction may well be successful
in dissuading the jury from entering onto the path of inference
in the first place, so that there is no incrimination to forget."
*Id.* at 208, 107 S.Ct. at 1708. The same cannot be said for
confessions that specifically reference a codefendant's complic-
ity in the perpetration of the crime, such as that evinced in
*Bruton.* There, Evans's confession directly implicated Bruton
as a perpetrator. It was precisely this type of confession that
prompted the Court to carve out its exception: "Specific
testimony that 'the defendant helped me commit the crime' is
more vivid than inferential incrimination, and hence more
difficult to thrust out of mind," the Court opined. 481 U.S. at
208, 107 S.Ct. at 1708. There did not, in *Richardson,* "exist
the overwhelming probability of the[ jurors'] inability to [dis-

regard the incriminating inference] that is the foundation of Bruton's exception to the general rule."[4] *Id.*

While holding that Marsh had been accorded her constitutional rights, the Court stated, however, that it expressed "no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." *Richardson*, 481 U.S. at 211 n. 5, 107 S.Ct. at 1709 n. 5. Indeed, neither the Supreme Court nor any Maryland appellate court has ever addressed the constitutional ramifications of replacing a defendant's name with a symbol or neutral word in an incriminating statement made by a codefendant.

Surveying other jurisdictions that have faced this issue, we find persuasive the reasoning and analysis employed by the D.C. Court of Appeals in *Smith v. United States*, 561 A.2d 468 (1989), wherein a symbol was used in the place of Smith's name in his codefendant's redacted statement to police. There, Smith and one Harris were tried together on a number of robbery charges. Harris had confessed prior to trial and named Smith as his accomplice. Prior to its admission, Harris's confession was redacted "by 'whiting out' all references to Smith and then penciling a rectangular boundary around each remaining blank space." 561 A.2d at 473. Fourteen such rectangular symbols appeared on Harris's two-page confession. In reviewing its impact upon Smith's Sixth Amendment rights, the D.C. Court of Appeals said:

> [A] properly and effectively redacted statement substituting neutral references for names (including nicknames and the like) and/or descriptions ... may be admitted into evidence at a joint trial (when coupled with proper limiting instructions) unless a 'substantial risk' exists that the jury will consider that statement in deciding the guilt of the defendant. *In order to determine whether a substantial risk*

---

4. The Court then went on to detail the problems inherent in applying the *Bruton* exception to only inferentially inculpatory evidence: "If extended to confessions incriminating by connection, not only is [compliance with *Bruton* by redaction] not possible, but it is not even possible to predict the admissibility of a confession in advance of trial." *Richardson*, 481 U.S. at 209, 107 S.Ct. at 1708. .

*exists, the trial court must consider the degree of inference the jury must make to connect the defendant to the statement and the degree of risk that the jury will make that linkage despite a limiting instruction.* The trial court's assessment as to whether the redaction effectively avoids linkage with the defendant must be made in the context of other evidence admitted at trial.[5]

*Id.* at 474 (emphasis added; citations and quotations omitted; omission in original). The court then held that, in light of the other evidence adduced at trial, there was a substantial risk that the jury had relied on Harris's confession in determining Smith's guilt; the jury was "virtually invited ... to use Smith's name to 'fill in the blanks.'" *Id.*

In the case *sub judice,* in moving the trial court to sever appellant's trial from Bell's, appellant's defense counsel argued:

Mr. Bell's statement, in its totality and in various parts, clearly is indicating a group activity in the beating death of Mr. Stacey Williams.

Therefore, it can only be inferred when these two gentlemen are sitting at the same defense table, that when [Bell] was implicating ... himself, that he ... must have implicated Mr. Gray.

Because we have no right to cross examine Mr. Bell as to his statement, Your Honor, I believe that the entire statement must be excluded, or in the alternative a severance must be granted. I think *Bruton* makes it clear that the reason for the red line type rule announced in *Bruton* was because of the fact that [appellant] would be denied his right to confrontation, and it would be a logical inference drawn by a jury that if one client made a statement concerning a group activity and two people are on trial for

---

5. This approach is known as the contextual analysis of *Bruton* questions.

that group activity, by implication the statement goes to the detriment of Mr. Gray....

The trial court denied the motion:

It seems to me ... that there is not a difficulty here with a statement which involves two people where we redact the name of the defendant who is making the motion, that there's going to be this compelling implication to the jury that the name that's been redacted or left out must be the name of the co-defendant.

To the contrary, I think that where you've got group activity and the evidence here is, apparently, going to be that there were at least five, and maybe as many as six men involved in this assault on the victim, to redact this statement, it seems to me, will not unduly prejudice Mr. Gray.

It seems to me that this statement can be sanitized in about three different spots so as to remove the names of Tank and Mr. Gray and the jury will not be left with the unavoidable inference or implication that the person Mr. Bell is referring to in the statement is Mr. Gray.

. . . . .

... I just don't see any prejudice befalling Mr. Gray if we can adequately sanitize this statement and take out any indication from Mr. Bell contained in this statement of the identity of anybody else who was involved in the assault. Not just Mr. Gray's name, but we're going to take out all of the names because the evidence is going to be that there were six people involved, and, therefore, to take out all of the names, that will not hurt Mr. Gray, it seems to me.

[APPELLANT'S ATTORNEY]: Well, Your Honor, the jury only has one other person to choose from because there are not five or six people on trial.

THE COURT: Oh, no. Well, I'll instruct the jury that the involvement or alleged involvement, or if the evidence seems to suggest that others are involved, obviously, they're not to consider that the others involved are not on trial. They should not speculate as to why others said to have been involved are not on trial. They are to consider only

the evidence against each of the defendants in reaching their verdicts, and, of course, I would instruct the jury that they are not to consider Mr. Bell's statement as evidence against Mr. Gray.... But I think that the redaction of the statement together with the instructions will avoid any prejudice to Mr. Gray.

[APPELLANT'S ATTORNEY]: The whole proposition of *Bruton* is that such a limiting instruction will not work in this type of situation.

THE COURT: ... I made this ruling, of course. In addition to the fact that, according to the State's proffer, there will be eyewitness identification of both defendants as among the six who committed the deadly assault on Mr. Williams.

[APPELLANT'S ATTORNEY]: Yes, but if the witnesses, if they do identify Mr. Bell and Mr. Gray as being among those six individuals, and then add to that a statement where Mr. Bell states that he was involved in the beating—

THE COURT: It makes the case against Mr. Bell simply stronger than Mr. Gray.

[APPELLANT'S ATTORNEY]: And it makes the case against Mr. Gray stronger.

THE COURT: I don't think so. I don't think so.

[APPELLANT'S ATTORNEY]: Because two people are named, one of them admits, oh, yes, I was involved, that clearly makes the evidence of that one witness appear more believable, and that witness is stating that two people were recognized.

THE COURT: I understand your position. Your motion for severance is denied.

Detective Pennington read Bell's redacted statement to the jury. In pertinent part, that which was read included: [6]

---

6. Prior to the statement being read into evidence, the court admonished the jury that the statement

Question, what can you tell me about the beating of Stacey Williams that occurred on 10, November, 1993?

Answer, an argument broke out between *deletion* and Stacey in the 500 block of Louden Avenue. Stacey got smacked and then ran onto Wildwood Parkway. Me, *deleted,* and a few other guys ran after Stacey. We caught up to him on Wildwood Parkway. We beat Stacey up. After we beat Stacey up, we walked him back to Louden Avenue. I then walked over and used the phone, Stacey and the others walked down Louden.

Question, when Stacey was beaten on Wildwood Parkway, how was he beaten?

Answer, hit, kicked.

Question, who hit and kicked Stacey?

Answer, I hit Stacey. He was kicked, but I don't know who kicked him.

Question, who was in the group that beat Stacey?

Answer, me, *deleted, deleted,* and a few other guys.

Question, do you know the other guy's name?

Answer, *deleted, deleted,* and me. I don't remember who was out there.

Question, did anyone pick Stacey up and drop him to the ground?

Answer, no, when I was there.

Question, what was the argument over between Stacey and *deleted?*

Answer, some money that Stacey owed *deleted.*

Question, how many guys were hitting on Stacey?

Answer, about six guys.

Question, do you have a black jacket with Park Heights written on the back?

---

is to be considered ... as evidence against Mr. Bell only and in no way is ... [it] to be considered ... as evidence against Mr. Gray. It is evidence against Mr. Bell only, and ... you will consider the evidence against each of the defendants individually and reach a separate verdict as to each defendant.

Answer, yea.

Question, who else has these jackets?

Answer, *deletion.*

Question, after reading this statement, would you sign it?

Answer, yes. He then signed it. [Emphasis added].

In reading the statement to the jury, where the written version indicated "deleted" and "deletion," Detective Pennington spoke the words "deleted" and "deletion."

Evidence otherwise directly implicating appellant in the commission of the crime came from two individuals—Tracey Brumfield and Shay Yarberough. Brumfield, a witness only to the chase, testified that appellant and Tank were among a group of twelve young men chasing Stacey Williams down the street, approximately ten to twelve feet behind him. She did not recognize the others in the group, getting only a four to five second glance at all of them as they passed approximately six feet in front of her. She admitted that she knew Tank and appellant were friends and were frequently seen together. She did not recognize Bell as one of the men chasing Williams. She stated that she then ran into Yarberough and that the two walked to the house of Williams's girlfriend. Yarberough testified that he witnessed Williams's beating from across the street and could only name Tank, appellant, and Bell as among the six individuals involved in the fray. He then described how Tank and appellant hit Williams and dropped him on his head several times. Bell was also seen hitting Williams. On cross-examination, however, it was revealed that, among other inconsistencies, Yarberough had apparently provided a statement to the police different from his testimony at trial, in which he stated he saw the altercation but did not know the identities of those involved in it.

■ In determining whether Bell's statement was sufficiently redacted, the trial court had to assess *Bruton*'s "substantial risk" criterion in light of the degree of inference the jury would have had to make to connect appellant to Bell's statement and the degree of risk that the jury would have

linked the two despite a limiting instruction. *See Smith,* 561 A.2d at 474.

■ Mere deletion of appellant's (and Tank's) name did not effectively make Bell's statement nonincriminating as to appellant. In the context of other evidence (Brumfield's and Yarberough's testimony), the jury need only have taken a short step in inferring that appellant was one of those involved. Stated otherwise, it did not have to make a substantial inference that appellant was the person neutrally referenced in the redacted statement. Therefore, there existed a "substantial risk" that the jury considered the statement in deciding appellant's guilt. Indeed, with Tank dead, the jury was "virtually invited . . . to use [appellant]'s name to 'fill in the blanks.'" *Id.* Simply stated, the use of "deleted" or "deletion" was insufficient to protect appellant against "the practical and human limitations of the jury system." *Bruton,* 391 U.S. at 135, 88 S.Ct. at 1627. *See also Greenwell v. United States,* 336 F.2d 962, 969 (D.C.Cir.1964) (replacing name of defendant with neutral term such as "named person" insufficient redaction since "with other evidence . . . connecting the co-defendants in the commission of the crime, it is difficult to believe that the jury was unable to divine who the 'anonymous nobody' referred to in the confession was"). Although, as the State argues, there were six perpetrators, any one of which the jury could infer was referred to by the deletions, only three were positively identified—Bell, appellant, and Tank. Appellant's role was clearly demonstrated by Bell's statement, rendering it facially incriminating and constitutionally violative. "To hold that there was not a substantial risk that the[ jury] would consider th[e] evidence . . . in considering [a codefendant]'s guilt (limiting instruction or not) would require us to wink at the reality of human behavior of jurors as recognized by the Court in both *Bruton* and *Richardson v. Marsh.*" *Foster v. United States,* 548 A.2d 1370, 1379 (D.C.App.1988).

Thus, the instant case represents a point on the continuum between *Bruton* and *Richardson* "where one cannot have the requisite degree of assurance that the jury will not improperly

consider the evidence in deciding the guilt of the defendant against whom the evidence is not admissible despite a proper limiting instruction." *Foster,* 548 A.2d at 1378. We add further that we distinguish *Richardson v. Marsh* by the manner of redaction employed. In *Richardson,* Marsh's role in the perpetration of the crime had been totally eliminated. There was no indication that anyone other than Williams and Martin committed the crime. In the instant case, however, appellant's role was disclosed, albeit with reference to a neutral person. Bell was not portrayed as solely having assaulted Williams and the jury could reasonably infer that it was appellant whose name had been "deleted."

 Given our conclusion that there existed a violation of appellant's constitutional rights, we now subject that violation to further analysis to determine whether it was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 22–23, 87 S.Ct. 824, 826–27, 17 L.Ed.2d 705 (1967) (Not all constitutional errors mandate reversal). Maryland courts employ a harmless error analysis in addressing federal constitutional errors. See *Adam and Green v. State,* 14 Md.App. 135, 144, 286 A.2d 546 (1972), *Shedrick and Beckwith v. State,* 10 Md.App. 579, 585, 271 A.2d 773 (1970), and *Ham, Lee, Bailey, and Cole v. State,* 7 Md.App. 474, 484, 256 A.2d 362 (1969) in the context of Sixth Amendment *Bruton*-type issues. As set forth in *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828, and restated in *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969), whether an error is harmless beyond a reasonable doubt "is to be based on an independent 'reading of the record and on what seems ... to have been the probable impact ... [of the tainted evidence] on the minds of an average jury.' " *Younie v. State,* 272 Md. 233, 246, 322 A.2d 211 (1974) (quoting *Harrington,* 395 U.S. at 254, 89 S.Ct. at 1728) (omissions and brackets in original). In other words, a constitutional error is not considered harmless if there is a reasonable possibility that improperly admitted evidence contributed to the conviction being challenged. *Schneble v. Florida,* 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340 (1972). Unless the State can prove

that the defendant would undoubtedly have been found guilty in the absence of the allegedly tainted evidence, its use will always be error. *Younie,* 272 Md. at 246–47, 322 A.2d 211. If, on the other hand, the State can show beyond a reasonable doubt that the violation is technical or the evidence cumulative of other overwhelmingly inculpatory evidence, no error will be found. *Id.* at 247, 322 A.2d 211.

In *Harrington v. California, supra,* the Supreme Court granted *certiorari* to determine whether admission of the statements of Harrington's codefendants, in violation of *Bruton,* nonetheless was harmless beyond a reasonable doubt, as sanctioned in *Chapman v. California, supra.* In *Harrington,* four men were jointly tried on robbery and murder charges. The respective confessions of Harrington's three codefendants were introduced at trial, tempered by appropriate limiting instructions.[7] Harrington's own testimony, as well as that of the testifying confessor, placed Harrington at the scene of the crime. Though varying, accounts of his possession of a gun and the extent of his participation in the commission of the crime were elicited from other witnesses. The Court began by recognizing *Chapman*'s axioms that no federal constitutional error is harmless unless held to be harmless beyond a reasonable doubt and that not all constitutional errors call for reversal of a petitioner's conviction. 395 U.S. at 251–52, 89 S.Ct. at 1727. The Court concluded that, in that case, harmless error existed despite clear *Bruton* violations, even in spite of the cumulative nature of the nontestifying codefendants' confessions, "[b]ut apart from them," because the other evidence "was so overwhelming." *Id.* at 254, 89 S.Ct. at 1728. The Court further rejected the suggestion that, if the mind of one juror was tainted by the violative confessions, reversal was mandated. Its judgment, the Court opined, "must be based on our own reading of the record and on what seems to us to have been the probable impact of the two confessions on the minds of an average jury." *Id.*

---

7. One of the confessors took the stand and, thus, was subject to defense counsels' cross-examination.

In the case *sub judice,* we are not persuaded by the State's assertion that the testimony of Brumfield and Yarberough, in addition to that of the medical examiner,[8] were "substantial evidence" of appellant's guilt so as to render a *Bruton* violation, if any, harmless beyond a reasonable doubt. In view of the conflicting evidence of appellant's presence *vel non* at the scene, the jury may well have considered Bell's statement to have enabled the State to overcome its burden of proof beyond a reasonable doubt. If so, it may have resulted in appellant's conviction. Simply because other evidence tends to inculpate a defendant does not render the use of a codefendant's statement, admitted in violation of *Bruton,* harmless beyond a reasonable doubt. Indeed, the testimony of the witnesses on which the State relies may not have been compelling at all in the minds of the jurors. Brumfield was not herself a witness to the altercation that resulted in Williams's death and Yarberough's allegedly differing statements could have adversely affected his credibility. Bell's statement "might well have tipped the balance in the jurors' minds in favor of conviction." *Harrington,* 395 U.S. at 257, 89 S.Ct. at 1730 (Brennan, J., dissenting). We are unable to hold that the use of Bell's statement, which we have determined violated appellant's right to confrontation, did not result in appellant's conviction.

Thus, we hold that the statement was ineffectively redacted and its use at the joint trial deprived appellant of his right of confrontation. We further hold that it was not harmless beyond a reasonable doubt. Accordingly, we reverse and remand for a new trial.

**JUDGMENT REVERSED; COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**

---

8. The medical examiner testified that Williams died as a result of trauma to his head, such as caused by being struck on a hard surface.