**STATE of Iowa, Appellee,**

v.

**Deandre L. JEFFERSON, Appellant.**

**STATE of Iowa, Appellee,**

v.

**David CARROLL, Appellant.**

Nos. 96–1603, 96–1678.

Supreme Court of Iowa.

Dec. 24, 1997.

Linda Del Gallo, State Appellate Defender, John M. Priester and James G. Tomka, Assistant State Appellate Defenders, and Chris Kragnes, Student Legal Intern, for appellant Deandre L. Jefferson.

John P. Roehrick and Susan Stockdale of Roehrick, Hulting, Blumberg, Kirlin & Krull, P.C., Des Moines, for appellant David A. Carroll.

Thomas J. Miller, Attorney General, Thomas S. Tauber, Assistant Attorney General, John P. Sarcone, County Attorney, and Daniel Voogt, Assistant County Attorney, for appellee.

Considered by HARRIS, P.J., and NEUMAN, SNELL, ANDREASEN, and TERNUS, JJ.

NEUMAN, Justice.

These are separate appeals by defendants, Deandre Jefferson and David Carroll, from convictions entered following their joint trial for attempted murder and robbery. Because their convictions stem from the same incident and share the same procedural history, we deem it expedient to decide both appeals in a single opinion.

Jefferson was convicted as charged. The principal question on Jefferson's appeal is whether a *Bruton*[1] violation occurred when the court permitted the introduction of Carroll's postarrest statements inculpating Jefferson in the crimes and, if so, whether the alleged constitutional error compels a new trial. Carroll—convicted of robbery and simple assault—challenges the sufficiency of evidence to convict, denial of his request for substitute counsel, error in instructing the jury on joint criminal conduct, and alleged ineffectiveness of counsel.

We conclude Jefferson's Sixth Amendment right of confrontation was violated and, because we cannot say with confidence that the error was not harmless beyond a reasonable doubt, we reverse and remand for new trial against him. We find no error warranting reversal of Carroll's convictions. Thus we affirm on Carroll's appeal, reserving questions of ineffective counsel for postconviction relief.

## I. *Background Facts and Proceedings.*

A jury could have found the following facts. On March 10, 1996, Steven November was working as a clerk at a Kum & Go convenience store on Hubbell Avenue in Des Moines. At about 4 a.m. two African–American males entered the store. They moved quickly to the counter, immediately arousing November's suspicion. One of the men was armed. He grabbed November by the collar and took him to a back room. There he ordered November to remove the videotape from the surveillance system. November could not do so because he had no key. The armed bandit then demanded a code for the cash register. Before November could comply, a buzzer sounded indicating that someone had entered the store. November was ordered to his knees and the assailant fired a gun at him. After two misfires the gunman turned to his accomplice and said, "How do you work this thing?" November retreated and grabbed a trash can to shield himself. Three more shots rang out. One bullet pierced November's abdomen, a second his chest, and the third grazed his shoulder. The robbers then fled.

A customer who had entered the store heard the gunfire and froze when one of the robbers emerged from the back room and headed for the door. The fleeing man wore a dark, hooded winter coat with a high collar that obscured his facial features. He was followed shortly by a man, similarly clothed, who held a gun in his right hand. The gunman approached the customer, shoving him to the floor.

Meanwhile another customer entered the store. He testified that as he passed through the front door a black male in a dark coat walked out. He heard another customer yell, "Watch out. The guy has got a gun." As the gunman ran toward him, the customer dodged out of the way and dropped to the floor.

This last customer's friends were waiting in his car in front of the store. When they

---

**1.** In *Bruton v. United States*, 391 U.S. 123, 137, 88 S.Ct. 1620, 1628, 20 L.Ed.2d 476, 485–86 (1968), the United States Supreme Court held that a defendant is deprived of the Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is admitted in evidence at their joint trial, even if the court instructs the jury to consider the confession only against the codefendant.

saw their friend drop to the floor, one ran to assist him. He reported that a "dark-complected" person 'wearing a dark jacket hurried past him at the doorway. The other friend ran to the side of the building where he heard car doors slamming. Returning to the front of the store, he relayed to those inside (who had dialed 911) that a two-tone Lincoln or Cadillac was speeding away.

A radio bulletin went out describing the fleeing vehicle. Police officer Chris Hardy heard the report and positioned himself at a highway exit near a plausible getaway route. At 4:20 a.m. he spotted a two-tone Cadillac carrying two black males. He approached the vehicle from behind and shined his spotlight on its interior. The car sped away. A chase on the outskirts of the city ensued, with speeds at times reaching 130 miles per hour. Dust billowing from the gravel roads made close tracking difficult. When the dust suddenly settled, the officer observed that the vehicle had left the road and come to a stop in a corn field. The car's passengers were nowhere in sight.

Other officers joined in a pursuit of the suspects on foot. They searched a nearby barn. One of the suspects was eventually found hidden beneath a pile of hay. As the officer approached and demanded he come out from under the hay, the suspect reportedly said, "I don't have the gun." The suspect, later identified as defendant Deandre Jefferson, was wearing an Orlando Magic jacket which did not fit the description of the coat worn by the gunman at the Kum & Go store. However a large size black coat was later found along the road taken during the chase.

Meanwhile a canine unit and an airplane with infrared equipment had been dispatched to the scene. Not far from the Cadillac, the dog discovered a black man passed out in the ditch. When he "came to" with the help of paramedics, he identified himself as David Carroll. Then, and later at police headquarters, he confessed to being at the scene of the crime. He explained that he had accepted a ride from a stranger. He claimed this "other guy" had a gun and unexpectedly robbed the convenience store; Carroll believed they were only stopping to ask directions.

The hospitalized store clerk, Steven November, was interviewed later in the day by police. He was asked to look at a photo array and immediately identified Jefferson as the gunman. He was unable to identify the man who accompanied Jefferson, noting that during the incident his concentration focused on the man with the firearm. None of the other witnesses at the Kum & Go could identify either perpetrator.

Jefferson and Carroll were charged jointly in a single trial information with attempted murder in violation of Iowa Code section 707.11 (1995), and first-degree robbery in violation of Iowa Code section 711.2. Both counts alleged violation of Iowa Code section 902.7, use of a firearm while participating in a felony. Jefferson unsuccessfully moved to sever their trials. *See* Iowa R.Crim. P. 6(4)(b) (jointly charged defendants may be tried jointly if trial "will not result in prejudice to one or more of the parties"). The court ruled that because Carroll's postarrest statements did not name Jefferson, no "*Bruton* problems" existed. At the close of the evidence it instructed the jury that Carroll's admissions were to be considered only on the question of Carroll's guilt or innocence.

The jury found Jefferson guilty as charged. As for Carroll, the jury found him guilty of first-degree robbery. On the attempted murder count, the jury returned a verdict against Carroll on the lesser-included offense of simple assault. *See* Iowa Code § 708.2(4). Both defendants have appealed.

## II. *Jefferson's Appeal.*

 Jefferson claims he was deprived of a fair trial by the district court's denial of his motion to sever. Generally a trial court's ruling on a motion to sever will not be disturbed unless an abuse of discretion is proven. *State v. Thornton,* 506 N.W.2d 777, 779 (Iowa 1993). Here, however, a constitutional defect is implicated. We review claimed violations of the confrontation clause de novo. *State v. Liggins,* 557 N.W.2d 263, 268 (Iowa 1996); *State v. Hoeck,* 547 N.W.2d 852, 856 (Iowa App.1996); *State v. Puffinbarger,* 540 N.W.2d 452, 455 (Iowa App.1995).

In seeking a separate trial, Jefferson anticipated a *Bruton* situation. Carroll's postarrest statements were allowed into evidence at the joint trial as admissions by a party opponent—against *Carroll's* interest. *See* Iowa R. Evid. 801(d)(2)(A); *Hoeck,* 547 N.W.2d at 856. Carroll chose not to testify, thus preventing Jefferson's counsel from cross-examining him. Carroll's hearsay statements, of course, would not have been admissible in a separate prosecution against Jefferson. Thus, Jefferson argues, his right of confrontation guaranteed by the Sixth Amendment to the United States Constitution was violated.

Jefferson relies on *Bruton v. United States,* 391 U.S. 123, 135–36, 88 S.Ct. 1620, 1628, 20 L.Ed.2d 476, 485 (1968), in which the United States Supreme Court held that a defendant is deprived of his constitutional right to confront witnesses when his nontestifying codefendant's confession, naming him as a participant in the crime, is placed before the jury at their joint trial. *Bruton* created an exception to the presumption that, in a joint trial, jurors will follow a limiting instruction. The question was whether jurors, when so instructed, could give due regard to permissible hearsay evidence against the codefendant but put out of their minds that same evidence, "powerfully incriminating" but inadmissible, against the defendant. *Id.* at 135, 88 S.Ct. at 1628, 20 L.Ed.2d at 485. The Court observed that

> [d]espite the concededly clear instructions to the jury to disregard [codefendant's] inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination.

*Id.* at 137, 88 S.Ct. at 1628, 20 L.Ed.2d at 485.

Carroll's admissions, which will be detailed further in this opinion, placed himself at the Kum & Go with "the other guy" with whom he fled in the escape vehicle. Jefferson contends these admissions virtually invited jurors to identify Jefferson as a participant in the crime. He argues further, under *Bruton,* the ineffectiveness of the limiting instruction which admonished the jury not to consider Carroll's admissions "in any way as evidence in this trial relating to Defendant Jefferson." Jefferson contends that the hearsay statements, entered into evidence at the joint trial, prejudiced the jury on its deliberations of his guilt, requiring a new and separate trial.

The State counters Jefferson's *Bruton* argument with *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). In *Marsh,* a codefendant's confession was redacted to eliminate not only the defendant's name but any reference to her existence as one of the perpetrators of the crime. *Marsh,* 481 U.S. at 211, 107 S.Ct. at 1709, 95 L.Ed.2d at 188. Finding no confrontation clause violation under this circumstance, the Court distinguished *Bruton* as follows:

> In *Bruton,* the codefendant's confession "expressly implicat[ed]" the defendant as his accomplice. Thus, at the time that confession was introduced there was not the slightest doubt that it would prove "powerfully incriminating." By contrast, in [*Marsh* ] the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony).

*Id.* at 208, 107 S.Ct. at 1707, 95 L.Ed.2d at 186 (citations and footnote omitted). Elaborating on the distinction, the Court went on to say:

> Specific testimony that "the defendant helped me commit the crime" is more vivid than inferential incrimination, and hence more difficult to thrust out of mind.

*Id.* at 208, 107 S.Ct. at 1708, 95 L.Ed.2d at 186.

The State argues no more than "inferential incrimination" occurred here. Its reliance on *Marsh* for this proposition is weakened, however, in one significant respect: Carroll's confession, while not specifically naming Jefferson, was not silent on the existence of an accomplice. His statements repeatedly referred to the "other guy" involved in the robbery. The *Marsh* Court expressly reserved opinion "on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." *Marsh,* 481 U.S. at 211 n. 5, 107

S.Ct. at 1709 n. 5, 95 L.Ed.2d at 188 n. 5. Not surprisingly, the question reserved in *Marsh* has spawned substantial litigation.

■ The United States Court of Appeals for the Eighth Circuit has focused its *Bruton /Marsh* inquiry on "whether the co-defendant's redacted confession *itself* implicates the defendant." *United States v. Jones,* 101 F.3d 1263, 1270 (8th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1566, 137 L.Ed.2d 712 (1997). If the "confession on its face incriminates a defendant," a *Bruton* violation occurs. *Id.* If, however, the statement standing alone does not "draw attention" to defendant, *Marsh* controls. *Id.* at 1269–70 (surveying Eighth Circuit cases). The facts in *Jones* illustrate the court's analysis. Jones, the kingpin of a large drug operation, allegedly ordered a "hit" on a dealer caught cheating. *Id.* at 1265–66. The hit man and Jones were jointly tried for murder and conspiring to distribute drugs. *Id.* at 1266. Jones challenged hearsay testimony admitted against the hit man, in which the hit man said the dealer "tried to jack *them* for some work, some of the dope. And *they* killed him." *Id.* at 1270. The court found no *Bruton* violation from the use of the plural pronouns, reasoning that "they" could have referred to anyone or a group of individuals acting with the codefendants. Accordingly, the court found no abuse of discretion in the admission of the confession. *Id.* In a footnote, the court distinguished *United States v. Bennett,* 848 F.2d 1134 (11th Cir.1988), in which use of the pronoun "they" in the redacted confession was directly linked to the unnamed defendant by the prosecutor in both opening and closing statements. *Id.* at 1270–71 n. 5. The *Jones* court explained that

> "they" and "someone" violate *Bruton* when the unnamed defendant is tied directly to the confession in the manner and context in which the confession is presented, but "they" and "someone" do not violate *Bruton* where the manner of presenting the confession and the context do not lead the jury directly to the defendant.

*Id.*

As other cases bear out, such distinctions are not easily drawn. The Maryland Court of Special Appeals, for example, ruling in a case in which two men were accused and tried jointly for a beating death, found a *Bruton* violation where the appealing defendant's role in the crime was "clearly demonstrated" by his codefendant's confession even though his name was replaced by "deleted." *State v. Gray,* 107 Md.App. 311, 667 A.2d 983, 990 (1995), *rev'd,* 344 Md. 417, 687 A.2d 660 (1997). Maryland's highest court reversed, reasoning that the fact that as many as six men may have participated in the beating prevented the jury from inevitably filling in the defendant's name where "deleted" appeared. *State v. Gray,* 344 Md. 417, 687 A.2d 660, 668(Md.), *cert. granted,* —— U.S. ——, 117 S.Ct. 2452, 138 L.Ed.2d 210 (1997). The United States Supreme Court has granted certiorari.

Our own court of appeals has recently decided three *Bruton* cases: *Hoeck,* 547 N.W.2d at 856–58; *State v. Means,* 547 N.W.2d 615, 623–24 (Iowa App.1996); and *Puffinbarger,* 540 N.W.2d at 457–58. *Hoeck* is particularly pertinent to our analysis here. Six males were charged in the shooting death of a seventeen-year-old female whose car they wanted to use in a convenience store robbery. Three of the accuseds—Hoeck, Means, and Voelkers—were jointly tried. Means' confession, offered against Hoeck, contained blank spaces to indicate where a name was redacted. *Hoeck,* 547 N.W.2d at 857. The court of appeals found a *Bruton* violation despite the redaction. *Id.* Its opinion quoted extensively from the trial transcript to illustrate that, by process of elimination, the jury was "clearly invit[ed] to insert Hoeck's name in the blank[s]." *Id.* at 858.

With these cases in mind, we turn to Carroll's admissions. The paramedic who revived Carroll asked him what events had led up to his unconsciousness—obviously seeking information about his medical condition. Carroll, instead, explained how he came to be at the scene of a crime. Over defense counsel's objection, the paramedic testified as follows:

> Q. (by the prosecutor) Mr. Ludwick, you can go ahead and tell us what the patient told you. A. As I recall the patient said he needed— asked for a ride from a

man. He got in the car. They stopped at the convenience store to ask for directions, and the male patient said he heard some noise. He was told to get into the car. They had drove real fast. They stopped the car, and the other gentleman told him to run fast.

Q. Did he tell you anything further about the use of any drugs or alcohol? A. Patient admitted to using alcohol and marijuana.

Carroll was then taken to the police station, where he gave statements to the police. Over counsel's objection, the investigating officer gave the following testimony at trial:

Q. (by the prosecutor) You may answer, Officer Bjornson. A. He advised me that he had been at a girl's residence. The girl was not there. He needed a ride and somebody that he did not know was going to give him a ride. They ended up going to a Quick Trip, and he was going to go in and ask for directions on how to get back to Highway 69 and 65 because they wanted to get back in Des Moines. He said he didn't know where they were at.

The other guy at this point—He said the other guy had a scrap. I asked him what he meant. He said it's a gun. He said the other guy pulled the gun out. He said then he heard the other guy say, "Give up the money. Give up the loot."

Q. To who? A. To the attendant. He said the other guy then told the attendant to go to the back room, and the other guy he was with grabbed the attendant by the arm and took him to the back room. He said he didn't hear any shots, but he did see the other guy pointing the gun at the attendant and that's when he took out the door.

I then asked him about the vehicle that they were in. He said it was the other guy's car. The other guy was driving. He said that the car was parked at the back and the side of the building. He then went on to say that he went to the car and waited. The other guy came out, and they then at that point took off.

They got out to a highway and the guy driving seen a cop. He said the driver panicked. He said, "We're going to do a high speed." The cop then chased after them, said the driver of the car stopped, told him to get out and run, so he did. He said that he went over by a ditch, laid down, and went to sleep.

The officer stated that he reviewed his notes with Carroll, and Carroll signed them, representing that they correctly reflected his statement. The interview continued, as related at trial by the testifying officer:

Q. (by the prosecutor) Officer Bjornson, after completing the statement, what did you do? Did you speak with Mr. Carroll further? A. Yes, I did. . . . I then asked him about where they had parked the car, and if he didn't think it was funny that they were parked behind the store. And he said he didn't think it was funny because he was just going to go in and ask directions. And at this point he said the store he went into was a Kum & Go.

I then drew on my notes a doorway showing the counter and a closet door which the attendant had been taken into which was described to me by Mr. Carroll, and then I had him show me where on my notes that he would have been in position as far as how far back he had went to the closet door which he showed me. And then I marked on my notes.

I started to ask him questions about being back by the closet. He said he did walk around back by the closet door, but he was just asking of the other guy, "What's going on?" He said at this point he'd seen two other guys come in the store and that's when he took off. He said he did not remember going into the closet where the incident took place. He said he did not remember hearing any shots. He just ran from the store.

Once again, he related to me that the store was a Kum & Go. He just went in to ask for directions to Highway 65 and 69, and it was the other guy that came in that had the gun.

Q. After your discussion in your questioning then with Mr. Carroll, you indicated to us you drew some—a map on some more notes; is that right? A. That's correct.

Q. After you completed that page of notes, did you again ask Mr. Carroll to review it? A. Yes, I did. I read everything to him that I had written down. He agreed that that's what he had told me, and I had him sign my notes once again

Given the content of the foregoing testimony, no redaction of Jefferson's name was necessary because neither witness testifying to the hearsay statements identified Jefferson by name. Indeed, the facts suggest that Carroll may not have known Jefferson's name, as they had just met earlier in the evening. The question remains whether the hearsay statements necessarily led the jury to identify Jefferson as the robber and gunman, in violation of *Bruton.* We think they did.

The State's case centered on two defendants accused of entering a convenience store, robbing the clerk at gunpoint, fleeing the scene, attempting to elude police in a high speed chase, and being apprehended near where the getaway car ended up in a corn field. Although Carroll's statements did not specifically name Jefferson as the culpable party to the crime, the statements nonetheless directly implicated him, and him alone. He was the only other defendant in the courtroom. No doubt could be left in a reasonable juror's mind that Jefferson was "the other guy," and principal player, identified in Carroll's statements. Moreover, no cautionary instruction by the court could convince the jury to disregard the testimony as it pertained to Jefferson, "the other guy." *See Bruton,* 391 U.S. at 137, 88 S.Ct. at 1628, 20 L.Ed.2d at 485 (no cautionary instruction could serve as adequate substitute for constitutional right of cross-examination). A clear *Bruton* violation occurred.

■ A *Bruton* violation need not automatically lead to reversal, however. *Hoeck,* 547 N.W.2d at 858. The Supreme Court has said:

In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error.

*Schneble v. Florida,* 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340, 344 (1972). Our court has similarly found that

even where a codefendant's extrajudicial confession is admitted erroneously, it may constitute harmless error if there is other overwhelming evidence of defendant's guilt, so that the prejudicial impact of the codefendant's statement was relatively insignificant.

*State v. Waterbury,* 307 N.W.2d 45, 48 (Iowa 1981); *accord Hoeck,* 547 N.W.2d at 858; *Means,* 547 N.W.2d at 624. *See Harrington v. California,* 395 U.S. 250, 253, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284, 287 (1969) (finding harmless error in failure to afford defendant opportunity to cross-examine codefendant where evidence against defendant overwhelming, including his own statement placing him at scene of crime).

■ It is important to note, however, that the harmless error analysis applied in the Sixth Amendment context requires a reviewing court to consider more than just the amount of untainted evidence against the defendant; that evidence must be weighed against the probative force of the tainted confession. *Cf. Harrington,* 395 U.S. at 256, 89 S.Ct. at 1729, 23 L.Ed.2d at 289 ("The focus of appellate inquiry should be on the character and quality of the tainted evidence as it relates to the untainted evidence and not just on the amount of untainted evidence.") (Brennan, J., dissenting). We addressed this "quantity versus quality" issue in *State v. Hensley,* 534 N.W.2d 379, 383–84 (Iowa 1995). There we observed that the inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered but whether the guilty verdict *actually* rendered in *this* trial was surely unattributable to the error." *Id.* at 383 (quoting *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182, 189 (1993)). We proceeded to identify two distinct steps in the harmless error analysis: (1) consideration of "the evidence the jury actually considered," that is, all the evidence before the jury, and, (2) the probative force of that evidence when weighed against the erroneously admitted ev-

idence. *Id.* In *Hensley,* that comparison favored the State. Circumstantial proof that a motorcycle in defendant's possession was stolen wielded far more probative force than defendant's uncertain, but erroneously introduced, admission that he "felt the motorcycle was stolen." *Id.* at 384.

Here there can be little quarrel that the untainted evidence against Jefferson was abundant. The store clerk, noting Jefferson's distinctive "chubby cheeks," positively identified him as the gunman. Witnesses' description of the car that sped away from the scene matched Jefferson's two-toned sedan. An officer on patrol spotted a car fitting that description soon after the robbery. When the officer approached Jefferson's vehicle he was led on a high speed chase. An abandoned winter coat like the one witnesses described the gunman wearing turned up on the chase route. When apprehended, Jefferson stated that he did not have "the gun."

The identity of the robbers, nevertheless, was hotly contested at trial. None of the witnesses but November claimed ability to identify Jefferson, and November's hospital-room identification—made while under treatment for serious wounds and after the defendants' photos were broadcast on television—met vigorous challenge by defense counsel. The weapon used in the assault was never found. Following the defendants' arrests, it was Carroll, not Jefferson, who had gunpowder residue on his hands.

Jefferson's defense of mistaken identity, however, was effectively gutted by Carroll's admissions inculpating him. Far from being "relatively insignificant" by comparison to the untainted proof, *see Hoeck,* 547 N.W.2d at 858, Carroll's statements immeasurably strengthened the State's case against Jefferson. As we have already stated, the *Bruton* violation is clear. We are also convinced that Jefferson was prejudiced by the error. The probative force of Carroll's inculpatory admissions is undeniable. No basis for introduction of the hearsay would have existed had Jefferson been tried separately from Carroll. In conclusion, we cannot say with confidence that the jury's verdict was *not*

attributable to the *Bruton* error. *See Hensley,* 534 N.W.2d at 383.

Jefferson was denied a fair trial by the erroneous and highly prejudicial introduction of his codefendant's admissions. His conviction must be reversed and the case against him remanded for a new trial.

### III. *Carroll's Appeal.*

Carroll mounts four challenges on appeal. First he claims the evidence in the record is insufficient to sustain his convictions for either robbery or assault. Second he cites error in the court's denial of his request for substitute counsel. Third he insists the court erred when it instructed the jury on a theory of joint criminal conduct. Finally he cites errors by trial counsel which he believes should be reserved for postconviction relief. We shall consider the arguments in turn, combining our discussion on sufficiency of the proof with Carroll's argument concerning joint criminal conduct.

**A. Sufficiency of Evidence; Joint Criminal Conduct.** At trial, Carroll's defense counsel joined in the introduction of his admissions to paramedics and police, evidently hoping the jury would view him as no more than an innocent bystander. The strategy succeeded, in part, inasmuch as Carroll escaped conviction for attempted murder. On appeal Carroll claims the statements must be viewed with suspicion, a "confused mixture" of fact and fiction planting doubt that he "was even present at the Kum & Go at the time of the shooting." We find no merit in this contention. Carroll's recitation of events surrounding the robbery was substantially corroborated by eyewitnesses who heard gunshots, saw two black men fleeing the store, and observed a getaway car matching the one abandoned in a corn field near the ditch where Carroll was found unconscious.

Carroll contends that even if it is assumed he was at the scene of the crime, the evidentiary record was insufficient to support his conviction for robbery. The State concedes he could not be convicted under this record as a principal. But it asserts the record amply supports his conviction as an aider and abettor. We agree.

To sustain a conviction on the theory of aiding and abetting, the record must contain substantial evidence that the accused

> assented to or lent countenance and approval to the criminal act either by active participation in it or by some manner encouraging it prior to or at the time of its commission.

*State v. Lewis*, 514 N.W.2d 63, 66 (Iowa 1994) (quoting *State v. Lott*, 255 N.W.2d 105, 107 (Iowa 1977)). An accused's participation in a crime may be inferred from "presence, companionship, and conduct before and after the offense is committed." *Id.* (quoting *State v. Miles*, 346 N.W.2d 517, 520 (Iowa 1984)).

By Carroll's own account he arrived at the Kum & Go with the person who committed the robbery. His claim that he believed they were only stopping for directions is belied by proof of the remote and inconvenient place they parked, behind the store. Carroll admitted he saw the other man pull out a gun, demand money, and force November toward a back room. Having seen this, Carroll neither left, intervened, nor protested. Instead he accompanied the gunman and November to the hallway behind the counter. According to November, when the gun misfired the gunman turned to his accomplice for assistance, an act supporting the inference that Carroll actually owned or furnished the pistol. Again, by Carroll's own account and the testimony of witnesses, the two left the scene together. Given this proof of Carroll's presence, countenance, and conduct before and after the robbery, a reasonable jury could find Carroll guilty of robbery under Iowa Code sections 711.1 and 711.2 as an aider and abettor.

The record is equally convincing, and appropriate, on the jury's verdict finding Carroll guilty of simple assault. *See* Iowa Code § 708.1 (defining assault); *State v. Powers*, 278 N.W.2d 26, 28 (Iowa 1979) (assault is a lesser-included offense of attempted murder). Carroll insists, again, that he could not be convicted of assault as a principal. The evidence was however sufficient to support his conviction under a theory of joint criminal conduct submitted by the court over Carroll's objection.

Iowa Code section 703.2 provides:

> When two or more persons, acting in concert, knowingly participate in a public offense, each is responsible for the acts of the other done in furtherance of the commission of the offense or escape therefrom, and each person's guilt will be the same as that of the person so acting, unless the act was one which the person could not reasonably expect to be done in the furtherance of the commission of the offense.

The elements for imposing joint criminal liability are:

1. Defendant must be acting in concert with another.

2. Defendant must knowingly be participating in a public offense.

3. A "different crime" must be committed by another participant in furtherance of defendant's offense.

4. The commission of the different crime must be reasonably foreseen.

*State v. Hohle*, 510 N.W.2d 847, 848 (Iowa 1994). "'[I]n furtherance of' is not limited to acts done to promote or advance the underlying crime, but includes acts done 'while furthering' that offense." *State v. Satern*, 516 N.W.2d 839, 844 (Iowa 1994). In *Satern* we distinguished joint criminal conduct from aiding and abetting as follows:

> Under section 703.1, the aider and abettor is held liable for the same crime which he or she has knowingly aided the principal in committing, either by act of participation in it or by some manner encouraging it prior to or at the time of its commission. Joint criminal conduct, on the other hand, takes the enterprise a step further. It contemplates *two* acts—the crime the joint actor has knowingly participated in, and a second or resulting crime that is unplanned but could reasonably be expected to occur in furtherance of the first one. Depending on the case, it may be appropriate for the court to instruct on both doctrines.

*Id.* at 843 (citations and internal punctuation omitted).

Here a reasonable jury could find Carroll knowingly aided and abetted an armed as-

sault for the purpose of committing a theft at the Kum & Go. This would constitute first-degree robbery under the instructions given by the court. *See* Iowa Code §§ 711.1, .2. A reasonable jury could also conclude that when the gunman shot at November in furtherance of the jointly planned and executed robbery, a separate assault was committed which Carroll did not plan and in which he did not personally participate, but which could reasonably be expected under the circumstances. This second act would support a verdict for the "different crime" of simple assault. It was arguably rational for the jurors to acquit Carroll of the higher charges of attempted murder and assault with intent to inflict serious injury on the theory that the State had not proven that Carroll could reasonably expect the gunman to actually attempt to kill or seriously injure the store clerk. No ground for reversal appears.

**B. Substitute Counsel.** On the fifth day of trial Carroll moved for substitute counsel. He cites error in the court's denial of his request, claiming the court erroneously focused on the competency of appointed counsel, rather than the communication breakdown he alleged. The State counters that error has not been preserved because Carroll's complaint to the court came in the form of a letter alleging ethical violations for failure of zealous representation. Neither party has it quite right. A fair interpretation of the record reveals that the court reasonably considered Carroll's request and applied the proper standard in its ruling.

■■■ Turning first to the State's preservation argument, we note the general rule that "issues must be presented to and passed upon by the district court before they can be raised and decided on appeal." *State v. Eames*, 565 N.W.2d 323, 326 (Iowa 1997). Defendant clearly alerted the trial court that he wanted "to fire" his defense counsel and have him replaced with another. Carroll's own words succinctly summed up the matter: "I want me a new lawyer." Although Carroll presented his request as an ethics complaint, the court kept him on track with the real issue of effective representation as shown by the following colloquy:

MR. CARROLL: Is it going to be possible for me to get another lawyer, that's what I'm asking?

THE COURT: Pardon me?

MR. CARROLL: Is my ethics complaint form able to go through or what?

THE COURT: Well, what I'm determining right now, Mr. Carroll, is whether I'm going to permit or grant your request to have Mr. Powers withdraw from this case. I haven't decided that yet, sir. That's what I'm deciding right now. You have asked that Mr. Powers be terminated as your lawyer.

DEFENDANT CARROLL: Yes, that's correct.

THE COURT: Well, that's the question I have to answer. That's the question, Mr. Carroll, that has been put before me. That is a request that you've made, and I have to decide whether to grant it or not.

The trial court's subsequent analysis of Carroll's request employed the standards recently articulated by this court in *State v. Brooks*, 540 N.W.2d 270, 272 (Iowa 1995). There we summarized the proof necessary to sustain a defendant's request for new counsel:

A defendant must demonstrate sufficient cause to warrant the appointment of substitute counsel. *State v. Webb*, 516 N.W.2d 824, 828 (Iowa 1994).... Sufficient reasons include a conflict of interest, an irreconcilable conflict with the client, or a complete breakdown in communications between the attorney and the client. *Webb*, 516 N.W.2d at 828. A defendant must ordinarily show prejudice, unless he has been denied counsel or counsel has a conflict of interest. *Williams v. Nix*, 751 F.2d 956, 960 (8th Cir.1985). In the present case, [defendant] must show prejudice because he does not claim either of the last two *Williams* grounds.

*Brooks*, 540 N.W.2d at 272.

■■■ Here, the court made two observations in denying Carroll's request. First, by responding to his allegation that he was not being zealously represented, the court reassured Carroll that he had competent counsel who was experienced in criminal defense.

The colloquy above shows that the judge was in no way attempting to make an ethics ruling.

The second observation, pertinent to the issue on appeal, addressed the quality of communications between the two, which is one of the criteria to be considered. *See id.* On that point, the court noted that while there clearly was friction between Carroll and his attorney, such "friction between a client and a lawyer is not uncommon." The court explained to Carroll that the client and lawyer "may not always be perfectly in sync" but evidence of an exchange of differing opinions "does indicate that there is an open discourse between the two." Implicitly the court found no "breakdown in communications." *Id.* Without unduly lengthening this opinion by citing the many exchanges between counsel and defendant on the record, we conclude the record amply supports the court's finding that Carroll and his attorney were, in fact, communicating.

It is also clear from the record that the court recognized Carroll's frustration with the criminal trial in which he was embroiled. When asked to provide specific reasons in support of his request, Carroll told the court that he and his attorney had quarreled over counsel's supposed "bad reputation of convicting people," concluding that "I feel I need somebody that's going to represent me correctly with some sense not negative. You know I'm sitting up in this jail stressing. I can't be with my family and got to deal with this mess." Rather than hinting of "irreconcilable conflict," this record reveals Carroll's frustration with the proceedings, a matter which the court aptly recognized "naturally attends this type of proceeding and the circumstances [defendant was] in."

As for the remaining justification for new counsel under *Brooks*—conflict of interest—Carroll asserts no claim. Thus he has provided no basis for relief under any of the three justifications outlined in *Brooks.*

The court was, of course, mindful that Carroll's request for new counsel came five days into the trial. Granting Carroll's request would have meant declaring a mistrial so that a new lawyer could be assigned. Disruption to the judicial process was a valid factor relied on by the trial court. *Cf. State v. Webb,* 516 N.W.2d 824, 828 (Iowa 1994) (finding that requests for substitute counsel should not be used as delay tactic). We conclude that no abuse of discretion in the trial court's denial of Carroll's request for new counsel has been shown.

**C. Ineffective Assistance of Counsel.** Finally, Carroll alleges ineffective assistance of counsel on three grounds: (1) failure of counsel to advise him adequately regarding character witnesses; (2) failure of counsel to present a full defense, that is, that he acted under the influence of drugs and alcohol; and (3) failure to adequately challenge the jury instruction on joint criminal conduct. Based on our discussion in division III. A., we conclude his third allegation is meritless.

Both parties agree that the other two allegations cannot be adjudicated on the present record. Accordingly, we preserve for postconviction review the question of whether Carroll received effective assistance of counsel concerning character witnesses and in presenting an adequate defense. *See State v. Baker,* 560 N.W.2d 10, 15 (Iowa 1997).

**IV. *Summary.***

To summarize, we reverse defendant Jefferson's convictions for attempted murder and first-degree robbery and remand for new trial. We affirm Carroll's convictions for first-degree robbery and simple assault. Carroll's claims of ineffective assistance of counsel are preserved for postconviction review.

**REVERSED AND REMANDED ON JEFFERSON'S APPEAL; AFFIRMED ON CARROLL'S APPEAL.**