**STATE of Iowa, Appellee,**

v.

**Hatsady LEUTFAIMANY, Appellant.**

No. 97–1057.

Supreme Court of Iowa.

Sept. 23, 1998.

Alfredo Parrish of Parrish, Kruidenier, Moss, Dunn & Montgomery, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Mary Tabor, Assistant Attorney General, John P. Sarcone, County Attorney, and Nan Horvat and James Ward, Assistant County Attorneys, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, CARTER, SNELL, and ANDREASEN, JJ.

HARRIS, Justice.

Defendant, who was charged jointly with three others, appeals following his convictions of first-degree murder, first-degree robbery, and willful injury. The fact that he was jointly tried with the other defendants looms large as a factor in the principal assignments. The trial court's refusal to sever the prosecution of this defendant for a separate trial is his most serious challenge, and the same refusal is reflected in other complaints because, as often happens, evidence appropriate in the case against one defendant is inappropriate in the case against another defendant. Denial of a fair trial is almost inevitably claimed under such circumstances, and such a claim is raised here. Although we concede there are disquieting aspects of the trial, we are convinced, for the reasons we shall explain, they do not call for reversal. We find no merit in defendant's numerous other assignments, and hence affirm.

Defendant Hatsady Leutfaimany is a twenty-one-year-old Laotian native who came to this country when he was thirteen years old. Along with three other men, Sy Roeuth, Kingkhoy Vongphakdy and Carl Kon Vongchanh, Leutfaimany undertook to rob a combined oriental food and jewelry store in Des Moines owned by Tom and Annette Banh.

The four entered the store at approximately 9:30 a.m. while the Banhs were preparing to open for the day. Tom Banh expressed concern about the men, but Mrs. Banh assured him everything was fine because she recognized Roeuth, whose parents were regular customers and friends. Tom proceeded to the back room to do paperwork.

Shortly thereafter Mrs. Banh heard gunshots and tried to run to the back room but was shoved to the floor by Leutfaimany. When Mrs. Banh tried to press the security alarm, Leutfaimany told her "don't do that." She nevertheless managed to press a remote alarm button prompting Leutfaimany to run to the back room where he yelled at Roeuth, calling him by his nickname: "Little man, let's go." The four men left the store without money or jewelry. The action near the front of the store, as well as the sound of voices and gunshots, was captured on videotape.

Mrs. Banh ran out the front door and called for help, then returned to find Tom in the back room lying face down near the safe, bleeding from his head. He died two months later after he was removed from life support.

The four men were later arrested and all gave incriminating statements to the police. Leutfaimany initially denied being at the grocery store during the robbery, but eventually acknowledged his presence there. He also admitted to police he was armed with a gun at the time. The four men were charged jointly in a single trial information with first-degree murder in violation of Iowa Code sections 707.1 and 707.2 (1995), first-degree robbery in violation of Iowa Code sections 711.1 and 711.2, and willful injury in violation of Iowa Code section 708.4. Leutfaimany moved to sever his trial, arguing mainly that pretrial confessions of the other defendants could not be admitted without incriminating

him. The trial court denied the motion, but, to ensure there was not a violation of their sixth amendment right to cross-examine witnesses, it required the State to redact references to the others from each defendant's statement.

The jury found Leutfaimany guilty as charged. The matter is before us on his appeal in which he assigns numerous errors.

■ I. Leutfaimany's first assignment challenges the trial court's denial of his motion to sever. Such a ruling is discretionary with the trial court and will not be disturbed unless an abuse of discretion is established. *State v. Thornton,* 506 N.W.2d 777, 779 (Iowa 1993). To establish an abuse of discretion, a defendant must show sufficient prejudice to constitute denial of a fair trial. *State v. Clark,* 464 N.W.2d 861, 863 (Iowa 1991). Leutfaimany attempts to narrow the deference we accord trial courts in such rulings by appending a due process claim under the fifth and fourteenth amendments of the United States Constitution and article I, section 9, of the Iowa Constitution. To the extent Leutfaimany claims a constitutional violation, our review of the evidence is de novo. *State v. Jefferson,* 574 N.W.2d 268, 271 (Iowa 1997). Our deference in severance rulings is not however weakened by the manner in which we review the facts unless that review produces a different factual scenario from that reflected in the trial court's ruling. That is not the case here.

■ To result in prejudice preventing a fair trial, the defenses must be more than merely antagonistic, they must conflict to the point of being irreconcilable and mutually exclusive. *Clark,* 464 N.W.2d at 863–64; *State v. Snodgrass,* 346 N.W.2d 472, 475 (Iowa 1984). This level of conflict and antagonism is reached if the jury, in order to believe the core testimony offered on behalf of one defendant, must necessarily disbelieve the testimony offered on behalf of a codefendant. *Clark,* 464 N.W.2d at 864.

Leutfaimany maintains, because he was merely present at the scene and not an active participant, his theory of defense was irreconcilable with the other codefendants. Leutfaimany primarily relies on *State v. Sauls,*

356 N.W.2d 516, 519 (Iowa 1984), in which both defendants testified at a joint trial and both offered the sole contention that he was innocent and the other defendant was responsible for the crime. We held the defenses were clearly irreconcilable and hence the parties' trials should have been severed.

The facts here differ significantly from those in *Sauls*. Leutfaimany was the only defendant to take the stand. Based on the codefendants' pretrial statements and the trial transcript, it appears that each defense had a common core: although the robbery may have been planned, the shooting was unintentional. For instance, the jury heard testimony from a California detective that Vongphakdy confessed to going armed to rob the oriental market, telling Tom Banh to "freeze" and then, as the grocer tried to grab the defendant's gun, shooting the victim five to eight times. The jury also received evidence that Roeuth admitted to police that he brought a gun to the store and knew of a plan to get money there. Vongchanh acknowledged to authorities that there was a plan to get money from the "old man." So none of Leutfaimany's codefendants completely denied involvement in the crime and none foisted the blame upon him. Leutfaimany's defense cannot be said to be irreconcilable with that of his codefendants.

Joint trials typically portend what is called a *Bruton* problem, a reference to *Bruton v. United States*, 391 U.S. 123, 135–36, 88 S.Ct. 1620, 1628, 20 L.Ed.2d 476, 485 (1968), in which two defendants, Evans and Bruton, were jointly tried. A federal agent testified concerning Evans' confession which stated that both he and Bruton had committed a crime. The trial court instructed the jury that the confession was to be used only against the declarant and not against Bruton. The court reversed Bruton's conviction, holding

> because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment.

*Bruton*, 391 U.S. at 126, 88 S.Ct. at 1622, 20 L.Ed.2d at 479. The court stated only those statements that are "powerfully incriminating" implicate the *Bruton* rule. *Id.* at 135, 88 S.Ct. at 1628, 20 L.Ed.2d at 485.

We visited the area in *Jefferson*, 574 N.W.2d at 275. There the two defendants, Carroll and Jefferson, were jointly tried. The two were accused of entering a convenience store and robbing a clerk at gunpoint. Carroll's pretrial statement, admitted at trial, placed him at the scene of the crime with "the other guy." Because the statement did not specifically name Jefferson, the court believed no *Bruton* violation existed. The court denied severance and no redaction was ordered.

In holding there was a *Bruton* violation we stated:

> Although Carroll's statements did not specifically name Jefferson as the culpable party to the crime, the statements nonetheless directly implicated him, and him alone. He was the only other defendant in the courtroom. No doubt could be left in a reasonable juror's mind that Jefferson was "the other guy," and principal player, identified in Carroll's statements. Moreover, no cautionary instruction by the court could convince the jury to disregard the testimony as it pertained to Jefferson, "the other guy."

*Jefferson*, 574 N.W.2d at 275.

The trial court in the present case addressed the *Bruton* problem by ordering prosecutors to redact from the confession of any nontestifying defendant those portions that inculpated the other three defendants. The State complied by deleting the names of the codefendants, and went further. Worried of the possibility the jury would assume from the context that the word "we" would be taken to refer to all four defendants, it eliminated all references to multiple parties and changed plural pronouns to singular pronouns.

The State contends this procedure was to comply with *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), in which the court clarified the *Bruton* holding. In *Marsh* a codefendant's confession was re-

dacted to eliminate, not only the defendant's name, but any reference to her as one of the perpetrators of the crime. *Marsh,* 481 U.S. at 211, 107 S.Ct. at 1709, 95 L.Ed.2d at 188. Finding no confrontation clause violation under this circumstance, the court distinguished *Bruton* as follows:

> In *Bruton,* the codefendant's confession "expressly implicat[ed]" the defendant as his accomplice. Thus, at the time that confession was introduced there was not the slightest doubt that it would prove "powerfully incriminating." By contrast, in [*Marsh* ] the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony).

*Id.* at 208, 107 S.Ct. at 1707, 95 L.Ed.2d at 186 (citations and footnote omitted). The court held

> that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence.

*Id.* at 211, 107 S.Ct. at 1709, 95 L.Ed.2d at 188.

*Bruton* and *Marsh* were revisited in *Gray v. Maryland,* — U.S. —, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998). *Gray* disapproved redactions replacing a name with an obvious blank space, a word such as "deleted," or symbols closely resembling the unredacted statements. A jury will often realize such redacted confessions refer to the defendant, and, because such an obvious confession might even call attention to the removed name, they are "directly accusatory." *Gray,* — U.S. at —, 118 S.Ct. at 1155–56, 140

L.Ed.2d at 301–02. The question asked in *Gray* was "who was in the group that beat Stacy?" The disapproved redacted answer was: "Me, deleted, deleted, and a few other guys." An appropriate redaction, the court suggested, would have been: "Me and a few other guys."

*Gray* thus disapproved the substitution of a neutral pronoun or symbol for a defendant's name when the substitution left it obvious that the alteration was a transparent effort to hide the identity of a specific person. The other federal authority suggests the substitution of a singular neutral pronoun for a plural one is permissible where the alteration does not make it apparent that the change was made in order to protect the identity of a specific person. *See United States v. Wright,* 742 F.2d 1215, 1223 (9th Cir.1984) (approving redaction of names and change of "we" to "I"), *overruled on other grounds, United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984).

Leutfaimany contends the introduction of his redacted statement prevented him from effectively asserting his defense—that he was "merely present" at the scene of the crime and was not a participant. He insists for example that when the district court redacted the statement to read "his plan" rather than "their plan," the court forced him to accept greater responsibility for what took place.

In Leutfaimany's view his "mere presence" defense, and his right to urge it, cannot depend alone on whether it was reconcilable with the defenses of his codefendants. But, even assuming this view to be correct, there is no indication the substitution of "I" for "we" in the redacted statements would impact on the mere-presence defense.[1] *See*

---

1. 1. **Original version:** Q. Yeah, but you knew, you knew they was going over there to rob the place. You knew that was going to happen. A. *They* was talking about it.

 **Redacted version:** Q. Yeah, but you knew, you knew they was going over there to rob the place. You knew that was going to happen. A. *There* was talk about it, and ...

 2. **Original version:** Q. What—what was you, what was you talking about getting? A. Uh, I don't know, *they* were talking about ____, you know, I—don't need—I never bother nobody, I didn't need to rob nobody.

 **Redacted version:** Q. What—what was you, what was you talking about getting? A. Uh, I don't know, *there* was talk about ____, you know, I—I don't need—I never bother nobody, I didn't need to rob nobody.

 3. **Original version:** Q. When you went up there, who had a gun? A. *Everybody.*

 **Redacted version:** Q. When you went up there, who had a gun? A. *I did.*

 4. **Original version:** Q. But you did go with the *others* knowing that they were going to go up there and rob that place. A. Uh huh.

*State v. Alsup*, 75 Wash.App. 128, 876 P.2d 935, 938–39 (1994) (no denial of mere-presence defense where "I" was substituted for "we," especially in view of other overwhelming evidence of participation in crime).

It is significant that Leutfaimany focuses in this complaint only on one trial court ruling: the witness, Timechy Outhonesak, quoted Vongphakdy (not Leutfaimany) as stating "it didn't go according to *his* plan," rather than as would have been accurate "it did not go according to *their* plan." The relevancy of this change on Leutfaimany's "mere presence" defense is highly conjectural. In any event any harm is largely remedied by the fact that Leutfaimany's unredacted pretrial statement was admitted and shown to the jury in its entirety.

Notwithstanding the foregoing authorities, we have serious misgivings about substitution of pronouns in testimony by witnesses sworn to tell nothing but the truth. When such a practice becomes necessary in order to accommodate defenses of multiple defendants, serious consideration should be given to severing the trial. On the facts here it is unnecessary for us to approve or disapprove such a substitution because of the overwhelming evidence of Leutfaimany's guilt, a matter we discuss in the following division.

■■■■■ II. Even if there was an error in redacting the pretrial statements, it was clearly harmless beyond a reasonable doubt. *See Jefferson*, 574 N.W.2d at 275 (stating once there has been a *Bruton* error, the prosecution has the burden of showing the error was harmless beyond a reasonable doubt). Whether an error is harmless depends on a variety of facts, including whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination, and, of course, the overall strength of the prosecution's case. *Id.* It is important to

note that the harmless-error analysis applied in the sixth amendment context requires a reviewing court to consider more than just the amount of untainted evidence against the defendant; that evidence must be weighed against the probative force of the tainted confession. *Id.* (citing *Harrington v. California*, 395 U.S. 250, 256, 89 S.Ct. 1726, 1729, 23 L.Ed.2d 284, 289 (1969) (Brennan, J., dissenting)). As we noted in *Jefferson*, the inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Id.* (quoted sources omitted). Two distinct steps are used in the harmless-error analysis: (1) consideration of "the evidence the jury actually considered," and (2) the probative force of that evidence when weighed against the erroneously admitted evidence. *Id.*

Here there can be no debate that the evidence incriminating Leutfaimany came close to being conclusive. An in-store videotape shows Leutfaimany wearing a stocking cap and entering the store the morning of the robbery. After the first shot was fired, Leutfaimany can be seen shoving Mrs. Banh to the floor. The State also presented evidence that the defendants did not park in the grocery store's parking lot, instead leaving the car out of sight around the corner. Leutfaimany testified that after the shooting he drove the car away from the scene, accompanied by Vongchanh and eventually picked up Vongphakdy and Roeuth along University Avenue. *See State v. Turner*, 345 N.W.2d 552, 556 (Iowa App.1983) (evidence showing defendant drove getaway car was sufficient to prove aiding and abetting in robbery).

The jury was also entitled to consider the fact that he initially lied to the police and only admitted his involvement when confronted with evidence of the videotape. *See State v. Liggins*, 524 N.W.2d 181, 188 (Iowa

---

**Redacted version:** Q. But you did go knowing that there was to be a robbery at that place? A. Uh huh.

5. **Original version:** Q. Where did you get your .380? A. They got it.

**Redacted version:** Q. Where did you get your .380? A. *I don't know about guns.*

6. **Original version:** Q. Then, damn it, tell me what's going on. Where are the bags? Where did that bag go? Who took it? A. I don't even know what *they* do with the bag.

**Redacted version:** Q. Then, damn it, tell me what's going on. Where is the bag? Where did that bag go? Who took it? A. I don't even know.

1994) (inconsistent stories may be viewed as evidence of guilt); *State v. Cox,* 500 N.W.2d 23, 25 (Iowa 1993) (same); *State v. Mayberry,* 411 N.W.2d 677, 682 (Iowa 1987) (same). Early in the interview Leutfaimany told detective Shaver that he did not go to the grocery store the morning of October 25, 1996:

> I don't know she going to identify me; I wasn't there. I was sleeping. I was at my friend's house, all I know is that she can't identify what she see. I mean I don't know anything about it.

Eventually though, Leutfaimany acknowledged his presence at the store during the robbery.

Leutfaimany initially denied knowing his companions were armed until he heard the shots, but later admitted to police that he and all three of his codefendants carried guns into the market. Leutfaimany also admitted to police that they were armed because they were going to rob the store. The evidence overwhelmingly establishes that Leutfaimany aided and abetted in the robbery of the market and the felony murder of Tom Banh.

 III. Leutfaimany contends the district court abused its discretion in failing to admit his pretrial statement in its entirety under Iowa rule of evidence 106(a). The rule provides in part:

> When [a] ... writing, ... or part thereof, is introduced by a party, any other part or any other ... writing ... is admissible when necessary in the interest of fairness, a clear understanding, or an adequate explanation.

Prejudice results in not admitting the entire statement "only where admission of the statement in its edited form distorts the meaning of the statement or excludes information substantially exculpatory of the declarant." *United States v. Comeaux,* 955 F.2d 586, 590 (8th Cir.1992) (quoted sources omitted). When this occurs severance is required.

The problem with this position is that Leutfaimany's unredacted pretrial statement was admitted into evidence in its entirety. It was played during the direct examination of Leutfaimany while the jury read from the written transcript. As a result Leutfaimany's challenge under rule 106 is moot.

 In his reply brief, Leutfaimany argues it was error for the district court to admit both his redacted statement and complete statement because it created a conflict which the court's instructions were unable to remedy. We do not however consider this issue because it was asserted for the first time in his reply brief. *Sun Valley Iowa Lake Ass'n v. Anderson,* 551 N.W.2d 621, 642 (Iowa 1996).

 IV. Leutfaimany claims the court erred in not excluding the redacted version of his statement to the police because the State missed, by approximately ten days, a deadline in placing the redaction in final form. He maintains the court's refusal to exclude the statement prejudiced him by limiting the amount of time counsel had to review it. Leutfaimany cites no authority for the proposition that a ten-day delay in the matter was prejudicial and we find none. The assignment is rejected. Iowa R.App. P. 14(a)(3).

V. Leutfaimany contends he was denied his sixth amendment right to confront the police officers who testified at trial because the court restricted cross-examination of police officers to areas that would not expose any of the redactions. We think this contention simply revisits the issue of admitting confessions of nontestifying defendants under *Bruton* and is without merit.

 VI. Leutfaimany asserts the trial court abused its discretion in denying his applications for pathologists and an interpreter. Our review of rulings on such an application is for abuse of discretion. *State v. Coker,* 412 N.W.2d 589, 593 (Iowa 1987). The right to expert witnesses falls within the sixth amendment right to counsel and, to the extent that Leutfaimany claims he was denied effective assistance, our review is de novo.[2] *See id.* at 591; *English v. Missildine,*

---

**2.** This constitutional issue is only preserved as it pertains to the denial of a forensic pathologist. Leutfaimany raised no trial court claim of a right to an interpreter.

311 N.W.2d 292, 294 (Iowa 1981); *State v. Hancock*, 164 N.W.2d 330, 333 (Iowa 1969). An indigent criminal defendant is not entitled to appointment of expert services at state expense unless there is a finding that the services are necessary in the interest of justice. Iowa Code § 815.7 (1995); Iowa R.Crim. P. 19(4); *State v. McGhee*, 220 N.W.2d 908, 910 (Iowa 1974). Leutfaimany bears the burden to demonstrate a reasonable need for the appointment of an expert. *Coker*, 412 N.W.2d at 593. When the accused is merely embarking on a "random fishing expedition" in search of a defense courts are discouraged from allowing State funds for experts. *Id.* at 592.

Leutfaimany asserts he needed his own forensic pathologist to review what he considers the "limited" autopsy performed by the State. He asserts this was necessary so he could determine whether the State could prove Mr. Banh actually died as a result of the gunshot wound to his skull. There is no suggestion that the medical personnel or family members acted imprudently in removing Mr. Banh from the respirators needed to support his breathing. It is beyond dispute that a bullet severed Mr. Banh's spinal cord, eliminating his brain's ability to communicate with the body. He had no normal brain function after October 25, 1996. The medical staff supported his respirations, blood pressure, and gave him medication to control seizures, but he showed no signs of improvement. The doctors advised the family that Mr. Banh would not survive without a respirator and that, given the extent of the injury to his brain, he would never awaken from the coma. Without question Mr. Banh died from oxygen deprivation due to the trauma caused by the passage of a bullet through his brain and spinal cord.

We said in *State v. Murray*, 512 N.W.2d 547, 550 (Iowa 1994), "it is well established that ordinarily negligent treatment or neglect of an injury will not excuse a wrong done unless the treatment or neglect was the sole cause of death." Thus, "[e]ven if the respirator was stopped prematurely, defendant [is] still liable, since intervening medical error is not a defense to a defendant who has inflicted a mortal wound upon another."

*State v. Inger*, 292 N.W.2d 119, 125 (Iowa 1980). Leutfaimany fails to show the appointment of a forensic pathologist was necessary to his defense. Accordingly the trial court did not abuse its discretion by denying the defendant's $3500 request for a forensic pathologist.

**■** VII. Alleging he was unable to understand and speak fluent English, Leutfaimany requested appointment of an interpreter. According to his expert, Leutfaimany could read at a fifth-grade level and became frustrated with reading assignments beyond the seventh-grade level. The district court, concluding Leutfaimany speaks, reads and understands English, denied the request for an interpreter. Leutfaimany also requested appointment of a Laotian interpreter to translate from English to Laotian his statement to the police, his advice of rights form, and a letter written by him in jail to one of the codefendants. These applications were denied on a finding that the proposed fees were excessive, but the court did offer to consider appointment of a local interpreter at less cost.

On appeal Leutfaimany does not explain why it was necessary to his defense to have these documents translated. The fact that he communicated with the police, and wrote a letter to a Laotian defendant in English, indicates he was not so deficient in English skills as to require an interpreter. His own testimony indicates he had no such need. He assured counsel that he understood all the questions that were asked on direct examination and had no trouble answering the prosecution's questions on cross-examination. Other circumstances also militate in favor of the district court's decision. Leutfaimany graduated from high school and wanted to attend college, but could not afford to do so. He was employed in English-speaking work places and spoke English with friends. We find no merit in Leutfaimany's contention that an interpreter was necessary for his defense. *See People v. Fioravantes*, 229 A.D.2d 784, 646 N.Y.S.2d 893, 894 (1996) (not entitled to interpreter when defendant had no difficulty understanding or speaking English based on audiotapes of alleged drug buy, and defendant testified on his own be-

half in English); *Abdallah v. State*, 924 S.W.2d 751, 753 (Tex.App.1996) (mere fact that defendant is more fluent in another language does not require trial court to appoint interpreter if defendant speaks and understands English); *State v. Yang*, 201 Wis.2d 725, 549 N.W.2d 769, 773 (1996) (Laotian who immigrated to the United States when twenty years old was not entitled to interpreter when he maintained employment in an English-speaking workplace, took courses at a technical college, and conversed with non-Laotian-speaking friends and family).

 VIII. Leutfaimany asserts the trial court abused its discretion in refusing his request to postpone the trial. On appeal he seeks to elevate this assignment to a constitutional claim under both the federal and state constitutions. But, because no constitutional basis for the claim was asserted in district court, it will not be so considered on appeal. *See Donovan v. State*, 445 N.W.2d 763, 767 (Iowa 1989).

 The decision to grant or deny a motion for a continuance of a criminal trial lies within the broad discretion of the trial court, and will not be reversed on appeal unless an injustice has resulted. *State v. Grimme*, 338 N.W.2d 142, 144 (Iowa 1983). Continuances are discouraged, and may be granted only upon a showing of "good and compelling cause" or when necessary to obtain "substantial justice." Iowa R.Crim. P. 8.1(2); *State v. Simmons*, 454 N.W.2d 866, 868 (Iowa 1990). This standard recognizes the interest of the State and defendant in a speedy and fair trial. *Grimme*, 338 N.W.2d at 144.

Leutfaimany's counsel entered an appearance on November 27, 1996, and trial commenced the following April 3. It is clear from the record that counsel cannot show the four intervening months were insufficient time for him to prepare for trial. Defense counsel, a respected and experienced attorney, was thoroughly prepared for the complex trial, and acquitted himself well. The assignment is without merit.

 IX. We find no merit in a challenge to admission of a letter addressed to Vongphakdy, seized while Leutfaimany was a prisoner. The claim that it was meant to be a letter to his attorney and thus privileged fails. *See State v. Craney*, 347 N.W.2d 668, 677 (Iowa 1984) (privilege under Iowa Code section 622.10 extends only to communications "entrusted" to a practicing attorney).

X. We have not overlooked, and now reject, a challenge to additional jury instructions, an evidentiary ruling on evidence suggesting police took money from the crime scene, allowing evidence of violation of jail policy, and the trial court's refusal to recuse itself. Discussion of these assignments and various other arguments would unduly extend this opinion and yield nothing of precedential value.

We find no reversible error.

**AFFIRMED.**