# IN THE COURT OF APPEALS OF IOWA

No. 19-0252
Filed April 29, 2020

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**KEITH ALEXANDER MAYES,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Black Hawk County, David P. Odekirk, Judge.

        The defendant appeals from his conviction for sexual abuse in the second degree. **AFFIRMED.**

        Christopher Kragnes Sr. and Kaitlyn C. Dimaria, Des Moines, for appellant.

        Thomas J. Miller, Attorney General, and Sheryl Soich, Assistant Attorney General, for appellee.

        Considered by Bower, C.J., and Greer and Ahlers, JJ.

**GREER, Judge.**

Keith Mayes appeals from his conviction for sexual abuse in the second degree. Mayes maintains the district court abused its discretion in determining the rape-shield law prevented the introduction of evidence the complaining witness had previously been shown a pornographic video, challenges the sufficiency of the evidence to support his conviction, and argues the court abused its discretion in granting the State's two requests for continuances.

**I. Background Facts and Proceedings.**

In August 2017, Mayes was living with his girlfriend and his girlfriend's four children. A.D. is the oldest of the four children; she was eleven at the time.

In the late afternoon of August 18, A.D.'s mother left for work. Mayes stayed at the home with the children. A few hours later, the mother returned from work. She learned that A.D. had told the neighbor, whom A.D. considered like a grandmother to her, that Mayes had hurt her that day by touching her in places he should not. The mother called 911, and Mayes left the home.

The same night, Mayes alerted the police that he believed they were looking for him and voluntarily spoke with officers at the police station. He denied the allegations A.D. made and allowed the officers to take a buccal swab for DNA testing.

At approximately the same time, a sexual assault nurse examined A.D. at a local hospital. The nurse completed a sexual assault kit, swabbing several areas on A.D.'s body and taking A.D.'s clothing for later testing.

In December, the state lab completed its testing and report. The report revealed seminal fluid was in multiple places on the underwear A.D. wore to the

hospital on August 18 and on the "bilateral buttocks" swab taken from A.D. The DNA from the seminal fluid matched Mayes's known DNA sample.[1]

Mayes was arrested and charged with sexual abuse in the second degree. His jury trial was to begin on September 25, 2018.

At the pretrial conference on September 21, the State moved for a continuance. The prosecutor said she was in the middle of a class "A" felony trial that would likely continue until the day before Mayes's trial started. And the State had been unable to locate and serve A.D. The prosecutor indicated,

> [S]ubpoenas have been out in this case since August. There are three return of services already in the file from the first time that subpoenas were sent out dated August 9th and August 15th. We have made efforts to locate [A.D.]. We've sent out subpoenas to other addresses that our files have indicated she might be residing at. That was done at the beginning of September. They still have not been able to locate her or her mother, for that matter, and I know that the Waterloo police investigations unit is also taking steps to locate her as well.

Mayes resisted the State's request. The court found good cause for the continuance and granted the State's request. The court continued the trial until October 30.

At the October 22 pretrial conference, the State requested another continuance. The prosecutor stated she was starting a murder trial the next day and did not expect to be available for trial on October 30. Mayes resisted the continuance, but the court granted a one-week delay. Mayes's jury trial began on November 6.

---

[1] According to the report, "The probability of finding this profile in a population of unrelated individuals, chosen at random, would be less than 1 out of 1.0 nonillion." At trial, the criminalist who completed the testing and authored the report testified that "nonillion" is "1 with 30 zeros behind it."

A.D.'s mother testified at the trial. She testified about going to work and leaving the children with Mayes, coming home and learning of A.D.'s allegation, and calling 911. On direct examination, A.D's mother was asked if she told A.D. what to say to medical personnel or the interviewer at the Child Protection Center (CPC). She testified she had not. She was then questioned if, after having sex with Mayes, she ever stored his semen; she said she had not. Finally when asked if she ever wiped Mayes's semen on A.D.; she said "no." On cross-examination, the following exchange occurred:

> Q. . . . [Y]ou were asked about sexual relations with Mr. Mayes? A. Mm-hmm.
>  . . . .
> Q. And the two of you were in a relationship? A. Yes.
> Q. It was indicated that obviously you had sex? A. Yes.
> Q. Apparently you were on birth control? A. Yes.
> Q. So Mr. Mayes would ejaculate in you? A. Yes.
>  . . . .
> Q. . . . So after having intercourse with Mr. Mayes, what was your normal course of action? A. Sometimes I go sleep or sometimes I get up and take a shower.
> Q. And isn't it true that sometimes you would grab the nearest clothing item, whatever the case might be, to assist in cleaning up? A. Yeah, a towel or something. Most likely a towel.
> Q. Sure. But whatever is there, whatever is convenient, right? A. Yeah.
> Q. All right. Do you have a washer in your house? A. No.
> Q. Where do you wash your clothes at? A. Miss Carole was helping me wash my clothes next door.
> Q. Next door? A. Mm-hmm, or the laundromat.

On redirect, the State asked the mother:

> Q. . . . [Y]ou were asked about the objects that you would use to wipe yourself up after having sex with [Mayes] and you mentioned using a towel? A. Mm-hmm.
> Q. Is that yes? A. Yes.
> Q. Would you ever use one of your child's underwear? A. What the fuck—excuse me. No.

A.D. also testified. According to her, she was lying on her mother's bed with her eyes closed when Mayes walked in, locked the door, and got into the bed with her. Though resistant to answer questions, A.D. testified that Mayes rubbed his hands up and down her bare legs. She testified he also used his hands to touch her "private part that's used for going pee." He touched her skin, not underwear, and he moved his hand "around." A.D. then got up from the bed to use the restroom. She cried in the restroom before ultimately returning to her mother's room. Mayes was not in the room when she returned. But after she got back in her mother's bed, Mayes returned and got in the bed again as well. Once back in the bed, Mayes "touched [her] private part that goes poop" with his "private part." The State asked A.D. if she knew what Mayes's private part is used for, and she responded, "To go to the bathroom." When asked if she meant it is used to pee, A.D. said yes. On direct examination, A.D. further testified:

> Q. [A.D.], at some point did [Mayes] touch you with his private part? A. Yes.
> . . . .
> Q. Now, [A.D.], when [Mayes] was touching your private part that goes poop with his private part, how were you laying on the bed? A. On my stomach.
> Q. And was your dress still on? A. Yes.
> Q. Where was your underwear? A. Around my ankles.
> Q. How did your underwear get down by your ankles? A. He pulled them down.
> Q. [A.D.] do you know or do you remember what [Mayes] was wearing that day? A. Some shorts, I think, and a T-shirt. Yeah, that's it.
> . . . .
> Q. At any point in time did he take his shorts off? A. Yes, I think so.
> Q. Why do you think that? A. Because.
> Q. Because why? A. I don't want to answer that.
> Q. [A.D.], when [Mayes] was touching your private part that goes poop with his private part, were [his] shorts still on? A. No.

> Q. Did he have any underwear on?  A. I don't know.
>
> Q. Did you feel any underwear?  A. No.
>
> Q. Was [he] moving his private part when he was touching your private part that goes poop?  A. Yes.
>
> . . . .
>
> Q. And how was he moving it?  A. Up and down.
>
> Q. [A.D.], at some point did you see some white stuff?  A. Yes.
>
> Q. Where did you see the white stuff?  A. I don't want to answer that.
>
> Q. Did you see white stuff on the sheets?  A. Yes.
>
> . . . .
>
> Q. Did you see white stuff on you?  A. Yes.
>
> Q. Where on you did you see the white stuff?  A. I don't want to answer that.
>
> Q. It would really help us understand if you could answer.  A. My legs, my arms, on the little cabinet thing.
>
> Q. So on your legs, your arms and the cabinet thing?  Yes?  A. Yes.
>
> Q. [A.D.], at some point in time did you see [Mayes's] private part?  A. Yes.
>
> Q. And where were you when you saw [his] private part?  A. Still on the bed.
>
> Q. And where was [Mayes]?  A. In front of me.

A.D. described the "white stuff" as "kind of clear and wet and cold."  Yet A.D.'s statements about where she saw the "white stuff" were inconsistent.  Swabs other than the "bilateral buttocks" swab taken by the nurse who completed the sexual assault exam were not positive for seminal fluid.

To support the State's case, the criminalist who completed the DNA testing testified as well.  She found seminal fluid in ten places on the underwear A.D. was wearing at the hospital along with the "bilateral buttocks" swab.  There was no DNA mixture in the sperm fraction, meaning the seminal fluid contained DNA of only one person—Mayes.  She also completed DNA testing on an epithelial fraction, or skin cells, and found two sets of DNA—one set consistent with A.D. and another set consistent with Mayes.  No DNA from a third person was found. The prosecutor asked the criminalist, "So if this particular seminal fluid that you saw had been in

contact with somebody else's vagina at some point in time, you would expect to find DNA from whoever's vagina that is on these items as well?" The criminalist responded, "I would think it would be highly likely that a vaginal area is very rich in DNA and does tend to transfer fairly easily."

Finally, the State played for the jury an audio recording of Mayes being interviewed at the police station in December 2017, after the police received the report Mayes's DNA and sperm had been found in A.D.'s underwear and on her body. On the recording, Mayes denies the allegations against him and blames A.D.'s mother. He suggests she saved his ejaculate from when they had sex and then put it in the places later located by the criminalist.

Mayes did not present any independent evidence.

The jury convicted Mayes of second-degree sexual abuse. *See* Iowa Code § 709.3(1)(b) (2017). He was later sentenced to a term of incarceration not to exceed twenty-five years. Mayes appeals.

**II. Discussion.**

**A. Rape-Shield Law.** At trial, Mayes sought to introduce evidence that A.D.'s mother's previous paramour showed a pornographic video to A.D. a few months before A.D. made the allegations against Mayes. Outside the presence of the jury, the State objected that the evidence was not admissible because viewing pornography constituted "other sexual behavior." *See* Iowa R. Evid. 5.412(a) (preventing admission of evidence of a victim's other sexual behavior in a criminal proceeding involving alleged sexual abuse).[2] While the court ruled Mayes could

---

[2] Mayes made an offer of proof, offering the video of A.D.'s interview at the CPC, during which she reported to the interviewer that she had been shown a video of

not ask if A.D. had seen pornography, he could ask if A.D. "had previously seen parts of the male anatomy." Mayes challenges the court's ruling, arguing the court abused its discretion. *See State v. Alberts*, 722 N.W.2d 402, 407 (Iowa 2006) ("We review trial court rulings on admissibility of evidence under rule 5.412 in criminal prosecutions for abuse of discretion.").

Iowa Rule of Evidence 5.412, also known as the rape-shield law, generally prevents the admission of evidence of the victim's "other sexual behavior" in criminal cases involving allegations of sexual abuse. *See* Iowa R. Evid. 5.412(a). There are some exceptions to the general prohibition. *See* Iowa R. Evid. 5.412(b). Even so, to have the evidence of other sexual behavior admitted under one of the exceptions, the defendant must "[f]ile a motion to offer the evidence at least 14 days before trial." *See* Iowa R. Evid. 5.412(c)(1)(A). Mayes filed no such motion here. For that reason, if A.D.'s viewing of a pornographic video constitutes other sexual behavior, the court did not abuse its discretion in determining the evidence could not come in at trial. *See Walker*, 935 N.W.2d at 878 (affirming the district court's ruling that the evidence the defendant sought to introduce was inadmissible when the defendant failed to file the motion to introduce the evidence at least fourteen days before trial and the defendant did not seek to excuse his failure to timely file the notice).

---

people engaging in sexual acts by her youngest sibling's father. The State responded, "As far as an offer of proof goes, I would have no problem stipulating to that portion of the [CPC] video, just for the offer of proof." As the State has not contested the fact that A.D. was previously shown a pornographic video, we proceed with the assumption that Mayes established that fact. *Cf. State v. Walker*, 935 N.W.2d 874, 877–78 (Iowa 2019) (considering whether the defendant established the underlying act occurred or whether it was "simply speculation").

Our supreme court has defined "other sexual behavior" as

> a volitional or non-volitional physical act that the victim has performed for the purpose of the sexual stimulation or gratification of either the victim or another person or an act that is sexual intercourse, deviate sexual intercourse or sexual contact, or an attempt to engage in such an act, between the victim and another person.

*State v. Baker*, 679 N.W.2d 7, 10 (Iowa 2004) (citation omitted).

Mayes argues that A.D. being shown a pornographic video does not constitute a "physical act" on A.D.'s part and therefore does not fall within the inadmissible category of "other sexual behavior." We disagree.

That A.D. was shown the video—rather than seeking it out—suggests it was non-volitional; it does not suggest it was not an "act." Additionally, A.D. watching the video is a "physical act," as it is "of or relating to the body"—not just the mind. *See Physical*, *Merriam-Webster.com* (Apr. 2, 2020), https://www.merriam-webster.com/dictionary/physical. We acknowledge it can be difficult to determine what constitutes sexual behavior. *See Alberts*, 722 N.W.2d at 408. But to suggest there is a non-sexual reason to show a pornographic video to a child defies logic. *See State v. Zaehringer*, 280 N.W.2d 416, 420 (Iowa 1979) (determining posing nude is not per se sexual behavior; absent a showing or implication of sexual activity of some sort accompanying posing nude, the evidence should have been admitted at trial). We cannot think of, and Mayes has not offered, any non-sexual reason for showing a child a graphic pornographic video. And while it seems no sexual contact occurred between A.D. and her sibling's father, we think this could unfortunately be described as "likely a precursor to sexual activity." *See Alberts*, 722 N.W.2d at 409. This precursor falls within "other sexual behavior." *See id.*

We reach this conclusion, in part, by considering the purpose of the rape-shield law, "which is to protect the victim's privacy, encourage the reporting and prosecution of sex offenses, and prevent the parties from delving into distractive, irrelevant matters." *Id.* These goals fit precisely into the decision to exclude the video show evidence.[3]

We agree with the district court that A.D. being shown a pornographic video falls within the general prohibition against evidence of the victim's "other sexual behavior." Further Mayes failed to follow the notice requirements to have that evidence admitted pursuant to a rule 5.412(b) exception. *See State v. Trane*, 934 N.W.2d 447, 462 (Iowa 2019) ("[S]tates may impose and enforce *reasonable* notice requirements for rape shield exceptions."). Thus, the district court did not abuse its discretion in ruling the evidence inadmissible.

**B. Sufficiency of the Evidence.** Mayes challenges the sufficiency of the evidence to support his conviction. We review claims regarding the sufficiency of evidence for a correction of errors at law. *State v. Romer*, 832 N.W.2d 169, 174 (Iowa 2013). "In reviewing challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn

---

[3] Even if evidence does not fall within the definition of "other sexual behavior," "[w]e note '[t]he evidence remains subject to all other applicable evidentiary requirements and considerations,'" such as relevancy and prejudice. *Alberts*, 722 N.W.2d at 410 (second alternation in original) (citation omitted); *see also* Iowa Rs. Evid. 5.402, 5.403. Here the trial court opined that "pornography in and of itself is of such a nature that the danger of unfair prejudice outweighs the probative value . . . ." Even if we examine the evidence under the Iowa Rule of Evidence 5.403 analysis, as the court referenced, we would find it inadmissible.

from the evidence." *Id.* (citation omitted). "We will uphold a verdict if substantial record evidence supports it." *Id.* (citation omitted).

In challenging the evidence supporting his conviction, Mayes likens his case to *State v. Smith*, 508 N.W.2d 101, 104–05 (Iowa Ct. App. 1993). In *Smith*, our court reversed convictions of sexual abuse for insufficient evidence after finding the complaining witnesses' "accounts of alleged abuse [were] inconsistent, self-contradictory, lacking in experiential detail, and, at times, border[ing] on the absurd." 508 N.W.2d at 103.

As Mayes points out, there were some inconsistencies in A.D.'s statements about the incident. Officers who responded to the 911 call reported A.D. told them that Mayes had stuck his tongue in her mouth and she had bit it, drawing blood. Photos of Mayes's mouth and tongue from the police station the night of the incident show no such injuries. Additionally, Mayes questions A.D.'s statement that the "white stuff" was cold, arguing it shows lack of experiential detail. A.D. made differing statements about where she saw the "white stuff" as well. And there was some question whether her siblings were on the floor near the foot of the bed watching a movie at the time of the incident or playing elsewhere.

But A.D. was generally consistent in her allegation—including location, identity of perpetrator, and general details about what happened. And she never suggested the perpetrator was anyone else nor recanted her allegation. While she was reticent to answer some of the questions at trial, she always answered. And, unlike in *Smith*, physical evidence corroborated A.D.'s allegation. This is not a case where the complaining witness's testimony was so inconsistent or absurd as to be without any credibility. *See id.* at 104 (concluding a complaining witness's

"testimony lacks the probative value needed to support a guilty verdict" because it was "self-contradictory, lack[ed] experiential detail, and describ[ed] scenes, such as the birthday party, that border on the surreal").

At trial, Mayes alluded to another explanation for finding his seminal fluid in A.D.'s underwear. On appeal, he urges us to accept that explanation rather than the one provided by A.D. But in our review for sufficiency of the evidence, we examine the evidence "in the light most favorable to the State." *Romer*, 832 N.W.2d at 174 (citation omitted). Substantial evidence, including testimony from a DNA analyst, supports Mayes's conviction for second-degree sexual abuse.

**C. Continuances.** Finally Mayes argues the district court abused its discretion in granting the State's two requests for a continuance. "We generally review a district court's denial of a motion for continuance for an abuse of discretion." *State v. Clark*, 814 N.W.2d 551, 560 (Iowa 2012).

"Motions for continuance are discouraged," and "[a] motion for continuance shall not be granted except upon a showing of good and compelling cause." Iowa R. Crim. P. 2.9(2). But "a trial court has 'very broad' discretion in ruling on a motion for a continuance." *See State v. LaGrange*, 541 N.W.2d 562, 564 (Iowa Ct. App. 1995) (citation omitted). And we will not "reverse[] on appeal unless an injustice has resulted." *State v. Leutfaimany*, 585 N.W.2d 200, 209 (Iowa 1998). Here, Mayes raises additional factors the district court should have considered before deciding the motions—"the inconvenience and cost, and most importantly, Mayes's custody status"—but does not otherwise establish an injustice that resulted from the continuances being granted. Without more, we cannot say the district court abused its discretion.

**III. Conclusion.**

The district court did not abuse its discretion in excluding evidence based on the rape-shield law or in granting the State's two requests for continuances. Additionally, because substantial evidence supports Mayes's conviction for sexual abuse in the second degree, we affirm.

**AFFIRMED.**