# IN THE COURT OF APPEALS OF IOWA

No. 22-0980
Filed September 13, 2023


**ROBIN LYNN INMAN,**
 Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
 Respondent-Appellee.
_____


Appeal from the Iowa District Court for Polk County, Jeanie K. Vaudt (motion) and David Nelmark (trial), Judges.


Robin Inman appeals the denial of funds for an expert witness and denial of her application for postconviction relief. **AFFIRMED.**


Lucas L. Asbury of Asbury Law, PLC, Des Moines (until withdrawal), and Janice B. Binder, Martelle, for appellant.

Brenna Bird, Attorney General, and Martha E. Trout, Assistant Attorney General, for appellee State.


Considered by Bower, C.J., and Ahlers and Chicchelly, JJ. Buller, J., takes no part.

**BOWER, Chief Judge.**

Robin Inman appeals the district court's denial of her application for funds for an expert witness and her application for postconviction relief. We affirm both of the district court's rulings.

**I. Background Facts and Proceedings.**

In October 2017, a jury convicted Inman of burglary in the first degree. The facts of the underlying conviction are as follows:

> Savu Cirligel is a Des Moines homeowner whose home was badly damaged in a fire. Cirligel and his family moved out of the home but left their possessions behind. Cirligel intended to repair the home and, ultimately, to move back. In April 2017, Cirligel noticed that his garage—where many of the family's valuables were being stored—was being broken into and items were being stolen. Local police were unable to assist Cirligel, so he decided he would spend some nights in the home in an attempt to catch any perpetrators in the act.
> Cirligel stayed in the basement of the split-level home on April 10; he was armed with a handgun. He did not have a phone with him, and the home did not have electricity.
> According to his testimony, Cirligel was waiting in one of the downstairs bedrooms when he heard someone walking around on the floor above him. He estimated it lasted for about five minutes before the person opened the basement door. He did not hear anyone speaking or calling out as they walked around upstairs. When the door opened, he saw a woman—Inman—wearing a "strong headlamp." Cirligel lifted the gun, and Inman began saying repeatedly, "Don't shoot me." Cirligel told the woman he was not going to shoot her and asked what she was doing in his home. She responded that she had a boyfriend with a gun who was out in the backyard. Cirligel grabbed her by the arm with the intention of removing her from the home. At one point in his testimony, Cirligel stated, "[They] fought up on the stairs," but he also testified Inman did not struggle on the way outside.
> After they got outside in the yard, Cirligel yelled for his neighbor to call 911. Inman—in an apparent attempt to break free from him—then began to fight with Cirligel. She used the scarf he was wearing to choke him and pull him to the ground. According to Cirligel, it was during the scuffle that he fired the gun and shot Inman. Inman fled to a nearby friend's home. Based on a separate 911 call, police and medical personnel were directed to the apartment of

Inman's friend. They found Inman conscious and laying on her stomach; she had been shot in her lower back. She was transported to a local hospital, where she ultimately underwent surgery for the injury.

Officer Dao Meunsaveng spoke to Inman at the hospital. Inman told him she had been out walking when she realized she was being followed by someone—a person she thought was her former boyfriend. She said he "gave her the look" so she decided to flee. She told the officer she ran until she found a house and then she jumped the fence and hid in the backyard of the home. While she was there hiding, she was confronted by a male. As she was climbing back over the fence to meet a friend who was picking her up in a vehicle, she heard a pop and felt a burning sensation.

Detective Danny White spoke to Inman approximately ten days after the incident. Inman told him she walking from a friend's house to a local convenience store to buy cigarettes when she noticed someone she believed to be her former boyfriend—who had been abusive—following her. After some discussion, Inman told Detective White that she was not sure the person had been the former boyfriend; "she thought it could be him in the way that he walked was like her ex-boyfriend but she was not positive that it was" him. She indicated she fled on foot and ultimately found a backyard with a shed that she hid behind. While hiding behind the shed, she saw an open window to the home and decided to enter. She climbed some barrels to get to a second-story deck and then entered the home through the window. Once she got inside, she walked around the house knocking on interior doors "to see if anybody is there" but also noted that the house appeared to be burnt. She then went downstairs, where she encountered Cirligel. According to Inman, she and Cirligel left the home, and while she was trying to flee from him, he shot her in the back. Crime scene investigators later recovered from Cirligel's yard a stun gun, a makeshift headlamp, and two gloves—one black glove and one camouflage glove.

*State v. Inman*, No. 17-1795, 2019 WL 156585, at *1–2 (Iowa Ct. App. Jan. 9, 2019). This court affirmed her conviction in early 2019. *See id.* at *3.

In September and November 2019, Inman filed applications for postconviction relief (PCR) claiming trial counsel provided ineffective assistance in several ways. The applications were consolidated in February 2020, and Inman later amended her claims to assert eight instances of ineffective assistance of counsel.

Inman filed a motion to employ an expert at state expense, claiming she needed a forensic gunshot expert to challenge the State's proof at trial and address her defenses. After a contested hearing, the court ruled Inman did not meet her burden of demonstrating a reasonable need to retain an expert and denied her request for funds.

At the PCR trial, the court received testimony from Inman. Depositions of Inman's trial attorney, Tomas Rodriguez; Cirligel; and Cirligel's neighbor, Tiffany Lo, were submitted as evidence, as were the detective's report and transcripts from the trial.

The district court examined and dismissed each of Inman's claims of ineffective assistance, finding counsel performed adequately and the proposed actions would not have changed the result of the trial.

Inman appeals the court's denial of funds for an expert witness and its ruling on two of her ineffective-assistance claims: failure to consult an expert witness and failure to challenge whether the house met the statutory definition of an "occupied structure."

## II. Standard of Review.

"We review decisions on [the] appointment of an expert for abuse of discretion." *Linn v. State*, 929 N.W.2d 717, 729 (Iowa 2019).

Because PCR applications alleging ineffective assistance of counsel raise a constitutional claim, our review is de novo. *Id.* at 730. We presume counsel acted competently. *Id.* at 731. "To succeed on a claim of ineffective assistance of counsel under the Sixth Amendment as applied to the states under the Fourteenth Amendment, a claimant must establish by a preponderance of the evidence that

(1) trial counsel failed to perform an essential duty and (2) this failure resulted in prejudice." *Id.* at 730. For the second prong, the claimant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 731 (citation omitted).

**III. Analysis.**

*Funds for expert witness.* Inman sought state funds to retain a forensic gunshot expert for the purpose of evaluating the trajectory of the gunshot injuring her. Inman argued, "the evidence, had it been fully developed, investigated and presented to a jury, would show that the injury alleged by [Cirligel] was not possible given how he described it happening, given that he described it happening at the time of the gunshot and given the location of the gunshot."

"An indigent criminal defendant is not entitled to appointment of expert services at state expense unless there is a finding that the services are necessary in the interest of justice." *State v. Leutfaimany*, 585 N.W.2d 200, 208 (Iowa 1998). The defendant "bears the burden to demonstrate a reasonable need for the appointment of an expert" rather than "embarking on a 'random fishing expedition.'" *Id.* (citation omitted); *see Linn*, 929 N.W.2d at 749.

That Cirligel shot Inman in the back was not disputed at trial. Cirligel admitted shooting her, though he was convinced he shot her in the side rather than the back. Testimony from a crime scene investigator, a responding officer, and the investigating detective all stated Cirligel shot Inman in the back. Thus, the jury already knew the events could not have occurred in the order and manner described by Cirligel but still found Inman committed all the elements of burglary

in the first degree—including an intentional or reckless infliction of bodily injury.[1] Testimony about trajectory from an expert witness would not change the proof supporting any of the elements of the offense at trial. The PCR court found Inman "failed to prove a reasonable need to retain an expert in this matter," and we agree.

*Ineffective assistance of counsel—expert witness.* Inman asserts her trial counsel was ineffective for failing to consult an expert witness to develop a possible defense. In a deposition submitted to the PCR court as evidence, Inman's trial counsel explained his reasoning:

> Because I believed that the physical evidence that the State had showed that she had to have been shot when she was not facing the alleged victim, because she was shot in the back. The injury she received was clearly to her back area and that the jury would have been able to see that she had been shot in the back and that it would be impossible for her to be shot while she was facing the alleged shooter. I don't know that an expert would have added anything else to that other than to confirm the physical evidence.

Counsel further testified,

> Q. All right. And then there was also some discussion about this gunshot wound to the applicant's—that the applicant sustained in this case. Do you recall that discussion? A. Yes.
> Q. And you believed that it wasn't necessary to have an expert witness talk about the location of the gunshot wound; is that right? A. Yes.
> Q. And that was just because, as a matter of common sense, the jury would be able to draw their own conclusions; right? A. Yes.
> Q. Would you agree that in a criminal case, the State bears the burden of proof? A. Yes.
> Q. And the defendant doesn't have to prove anything; right? A. Correct.
> Q. Sometimes going out and trying to get an expert witness, well, that might not end up being helpful to your client; right? A. Correct. Sometimes the witness—expert witnesses don't help.
> Q. And this was a case where you felt that it just wouldn't be— there was no upside to calling an expert. Is that fair to say? A. Yes.

---

[1] Cirligel had red marks on his neck, which a crime scene investigator testified were consistent with Cirligel's complaint.

Q. Would you agree that the defendant in this case was charged with burglary in the first degree? A. Yes.

Q. And that it was under a theory that she entered the house with the intent to commit a theft? A. That's correct.

Q. The gunshot wasn't one of the elements of the case; right? A. No.

In its ruling, the PCR court noted Cirligel denied shooting Inman in the back at trial and contrasted that claim with multiple law enforcement personnel stating Inman's injury was to her back. The court was not persuaded Inman's counsel was deficient on this question and explained it "does not see how additional evidence confirming the location would have made any difference." The jury apparently either concluded the victim was simply mistaken or that, even if the victim was not truthful on this point, the elements of the charge had still been proven."

Counsel's testimony clearly indicated it was a strategic decision to not use an expert witness, noting sometimes expert witnesses do not help and here "there was no upside." "Miscalculated trial strategies and mere mistakes in judgment normally do not rise to the level of ineffective assistance of counsel." *Ledezma v. State*, 626 N.W.2d 134, 143 (Iowa 2001). Trial counsel was able to establish through clear evidence—including testimony by investigating law enforcement and a photograph of the injury—Inman was shot in the back, discrediting Cirligel's testimony of how he and Inman were situated at the time of the shot. Counsel's actions were reasonable under the circumstances, and Inman did not establish counsel provided ineffective assistance.

*Ineffective assistance of counsel—occupied structure definition.* The supreme court has examined what constitutes an occupied structure for purposes

of the burglary statute and concluded "the State must produce substantial evidence to support two independent elements . . . , one related to place and the second related to activity, purpose, or use." *State v. Rooney*, 862 N.W.2d 367, 376 (Iowa 2015). Inman argues trial counsel should have challenged whether the house met the "activity, purpose, or use" element.

Trial counsel explained why he did not challenge whether the damaged house was an occupied structure:

> I believed it fit the definition of an occupied structure. . . . I don't think it matters whether anybody lives there or not at the time. The owner still had access to the property. The owner would be present at the property. And, further, the owner was present at the property when this occurred. So clearly there was someone occupying this property.

Iowa Code section 720.12 provides three alternative ways for a structure to meet the second prong, that it is "adapted for overnight accommodation of persons, or occupied by persons for the purpose of carrying on business or other activity therein, or for the storage or safekeeping of anything of value." The district court found Cirligel's house "was clearly 'adapted for overnight accommodation of persons'" despite its condemnation, and the structure was occupied by Cirligel "for the purpose of carrying on business or other activity therein."[2]

The test for "adapted for overnight accommodation" looks at the time of the burglary, and can "turn on the subjective intent of the property owner, an objective

---

[2] The jury's instructions at trial included the statutory alternatives of an occupied structure, and the marshalling instruction included as an element the State was required to prove, "The residence was an occupied structure as defined in [the relevant] instruction".

analysis of the condition of the property, or perhaps upon actual use of the property." *Id.* at 377.

Even if it was not presently fit for accommodation, the State could establish an alternative basis for the residence as an occupied structure because it was adapted "for the storage or safekeeping of anything of value." Cirligel testified his belongings—"[p]retty much everything"—were secured in his house and garage; he had locked the house and boarded the door to secure his property. Based on frequent visits by Cirligel and his storage of all his personal property in the house, it met the statutory definition of occupied structure.

Because the house qualified as an occupied structure, trial counsel did not fail an essential duty by not challenging the status of the residence as an occupied structure. Inman's claims of ineffective assistance of counsel fail.

**AFFIRMED.**